[Crim. No. 1310. In Bank.—July 10, 1906.]

THE PEOPLE, Respondent, v. F. N. STAPLES, Appellant.

CRIMINAL LAW—MURDER—MOTION TO WITHDRAW PLEA AND MOVE TO QUASH INDICTMENT—DISCRETION—GROUND NOT SHOWN.—A motion by a defendant charged with murder for leave to withdraw a plea of not guilty after the case has been set for trial by consent, and to move to set aside the indictment, is addressed to the discretion of the court; and where no ground was set forth upon which a motion to set aside the indictment could be based, the court properly refused to grant the motion.

ID.—SHOWING OF INEXPERIENCE OF COUNSEL.—A showing of inexperience of counsel in not moving to set aside the indictment, not supplemented by a showing of ground for such motion, is insufficient.

ID.—RENEWAL OF MOTION WITHOUT LEAVE ON GROUNDS STATED—INSUFFICIENT SHOWING—WAIVER.—A motion for leave to withdraw the plea and to move to set aside the indictment having been refused, the defendant had no right, without leave of the court to do so, to renew the motion for such permission upon a showing by affidavits of grounds for a motion to set aside the indictment; and such showing is insufficient to entitle them to leave to renew the motion where there is no showing that the grounds stated were not known when the first motion was made. In the absence of any showing of ignorance, it is reasonable to infer that they were then known, and were waived by failure to present them at that time.

ID.—MOTION TO CHANGE VENUE — BIAS AND PREJUDICE — POSTPONEMENT—FILLING OF PANEL.—Notwithstanding a strong showing by

affidavits for the defendant of a strong bias and prejudice against him in the county where the murder is charged to have been committed as a ground for motion to change the venue to another county, it was not error for the court to postpone the hearing of the motion until after an attempt to secure an unbiased panel, with leave to renew it if a full panel could not be obtained; and after obtaining a full panel, if defendant did not thereafter renew the motion, he cannot complaint of error upon the original motion.

ID.—MURDER BY POISONING—CIRCUMSTANTIAL EVIDENCE—INSUFFICIENCY TO SUSTAIN VERDICT.—Upon review of circumstantial evidence, *held* that a verdict finding the defendant guilty of murder in the first degree by administering poison to his deceased wife was not sustained by evidence sufficient to justify it.

ID.—BURDEN UPON PROSECUTION—FAILURE OF PROOF—QUESTION OF LAW.—When the evidence of poisoning is purely circumstantial, the burden rests upon the prosecution to show that it is not only consistent with the hypothesis of guilt, but is inconsistent with any other reasonable hypothesis; and where every circumstance relied upon as incriminating is equally compatible with the presumption of innocence, there is a failure of proof, and the question is one of law for the court.

ID.—PROVINCE OF JURY.—The right of a jury to return a verdict of guilty is not an arbitrary right; and no jury have a right to declare forfeited the life of a defendant upon mere suspicion, especially when the facts upon which the suspicion might be generated are entirely consistent with his innocence.

ID.—MOTIVE ALONE NOT SUFFICIENT.—The existence of a motive for the supposed crime in meretricious relations subsequently assumed with another woman by the defendant, though a circumstance to be considered by the jury, is not alone sufficient to convict, in the absence of evidence· showing the fact of death of his wife from poison administered by him to her.          ⚬

ID.—CHANGE OF RESIDENCE BY DEFENDANT.—The fact that defendant repeatedly changed his residence while carrying on his profession as a physician under his own name, and living in meretricious relations with such other woman, while proper for consideration by the jury, yet in the absence of any proof of knowledge that he was suspected of causing his wife's death and, in the absence of sufficient proof of his guilt, cannot justify the verdict of guilty.

ID.—IMPROPER EVIDENCE OF MOTIVE—LOSS OF RESIDENCE BY FIRE.—It was improper to admit as evidence of motive the . destruction of defendant's rented premises by fire, where there is no proof that defendant committed arson or that his wife knew about the fire.

APPEAL from a judgment of the Superior Court of Amador County and for an order denying a new trial. R. C. Rust, Judge.

The facts are stated in the opinion of the court.

William G. Snyder, A. Caminetti, and William J. McGee, for Appellant.

The court erred in not allowing the plea to be withdrawn and a motion made to set aside the indictment upon the statutory grounds. (Pen. Code, secs. 995 (subds. 2, 4), 996; *People* v. *Geiger,* 49 Cal. 643; *People* v. *Turner,* 39 Cal. 370; *People* v. *Warner,* 147 Cal. 546, 82 Pac. 196; *People* v. *Vallarini,* 66 Cal. 230, 5 Pac. 154.) The court erred in not changing venue. (*People* v. *Yoakum,* 53 Cal. 566, 571; *People* v. *Vincent,* 95 Cal. 428, 30 Pac. 581; *People* v. *Elliott,* 80 Cal. 296, 22 Pac. 207.) The court erred in allowing evidence to show the burning of the house as a supposed distinct offense. (*People* v. *Sanders,* 114 Cal. 230, 46 Pac. 153; *People* v. *Jones,* 32 Cal. 80; *People* v. *Tyler,* 36 Cal. 526; *People* v. *Stewart,* 85 Cal. 175, 24 Pac. 722; *People* v. *McNutt,* 64 Cal. 116, 28 Pac. 64; *People* v. *Barnes,* 48 Cal. 551; *People* v. *Molineux,* 168 N. Y. 291, 61 N. E. 286; *People* v. *Cunningham,* 66 Cal. 668, 4 Pac. 1144, 6 Pac. 700, 846; Underhill on Criminal Evidence, sec. 88, p. 110; *Shaffner* v. *Commonwealth,* 72 Pa. St. 63, 13 Am. Rep. 649; *Farris* v. *People,* 129 Ill. 521, 21 N. E. 822-824, 16 Am. St. Rep. 283.) The verdict is against the evidence, the *corpus delicti* not having been proved. (*People* v. *Simonsen,* 107 Cal. 346, 347, 40 Pac. 440; *People* v. *Tapie,* 131 Cal. 651, 63 Pac. 1101.) There is no proof that the deceased died from any poison administered. Where the circumstances are all consistent with innocence, the question is one of law for the court. (*People* v. *Eagan,* 116 Cal. 287, 291, 48 Pac. 120; *People* v. *San Martin,* 2 Cal. 484; *People* v. *Jones,* 31 Cal. 565; *People* v. *Gossett,* 93 Cal. 644, 29 Pac. 246; *People* v. *Owens,* 148 N. Y. 651, 43 N. E. 71; *Ruloff* v. *People,* 18 N. Y. 179; *People* v. *Bowers,* 79 Cal. 415, 418, 21 Pac. 752.)

U. S. Webb, Attorney-General, C. N. Post, Assistant Attorney-General, and J. Charles Jones, for Respondent.

The evidence is sufficient to sustain the verdict. It was proper to consider the flight of the defendant as evidence of a consciousness of guilt. (*Hickory* v. *United States,* 160 U. S. 408, 16 Sup. Ct. 327; *People* v. *Armstrong,* 114 Cal. 570, 46 Pac. 611; *People* v. *Ross,* 115 Cal. 233, 46 Pac. 1059;

*People* v. *Flannelly,* 128 Cal. 83, 60 Pac. 670; *People* v. *Strong,* 46 Cal. 302; *People* v. *Giancoli,* 74 Cal. 642, 16 Pac. 510; *People* v. *Fine,* 77 Cal. 147, 19 Pac. 269.) The motion for leave to withdraw the plea and move to set aside the indictment was properly overruled in both cases. (*People* v. *Lee,* 17 Cal. 80.) Grounds known to exist on the first motion must be deemed waived. (*Kinneberg* v. *Kinneberg,* 8 N. Dak. 311, 79 N. W. 337; *Fifth-Avenue Sav. Bank* v. *Cooper,* 19 Ind. App. 13, 48 N. E. 236; *Wooters* v. *Craddock* (Tex. Civ. App.), 46 S. W. 916.) The court did not err in its ruling upon the question of venue. (*People* v. *Goldenson,* 76 Cal. 328, 19 Pac. 161; *People* v. *Fredericks,* 106 Cal. 554, 39 Pac. 944; *People* v. *Plummer,* 9 Cal. 298.) The evidence of the fire was admissible on the question of motive. (Rice on Evidence, p. 217; *People* v. *Harris,* 136 N. Y. 423, 32 N. E. 65; *Stout* v. *People,* 4 Park. Cr. Rep. 132; *People* v. *Lane,* 100 Cal. 379, 34 Pac. 856; *People* v. *Cook,* 148 Cal. 334, 83 Pac. 43; *People* v. *Rogers,* 71 Cal. 565, 12 Pac. 679.) No question of law arises upon the evidence, and the verdict of the jury is conclusive. (*People* v. *Harris,* 136 N. Y. 423, 32 N. E. 65; *People* v. *Fitzgerald,* 138 Cal. 41, 70 Pac. 1014; *People* v. *Buckley,* 143 Cal. 379, 77 Pac. 169.)

LORIGAN, J.—The defendant was indicted for the murder of his wife in Amador County, convicted, sentenced to death, and appeals from the judgment and an order denying his motion for a new trial. Many grounds are urged for a reversal, but it is mainly insisted that the verdict of the jury was not warranted from the evidence.

Before we approach the consideration of this claim, however, it is necessary to dispose of other points raised by defendant prior to the actual trial, which were ruled on adversely to him, and upon which he predicates error. These points are that the court erred in refusing to grant the motion of defendant to be permitted to withdraw his plea of not guilty, so that he might move to set aside the indictment filed against him, and also erred in denying his motion for a change of venue.

As to the motion to permit a withdrawal of his plea. It appears that upon the arraignment of defendant, March 9, 1905, he was represented by an attorney, and the time for

receiving his plea continued until March 11, 1905, at which date he entered a plea of "Not guilty," and the time for trial, by consent of said attorney, was fixed for April 10, 1905. Neither at that time nor prior thereto was any suggestion made that defendant desired to move to set aside the indictment, nor was any motion of that character interposed. Subsequent to the arraignment and plea, defendant having procured additional counsel, they gave notice that on March 27, 1905, they would move the court to grant a continuance of the time of trial for a month and to permit defendant to withdraw his plea of "Not guilty," and make such motion relative to the indictment as they might be advised, said motion being based on the grounds that defendant could not prepare for trial on the day set, and that the plea of "Not guilty" was inadvertently entered. The motion was based upon affidavits which were addressed mainly to a showing for a continuance, although as to the motion for leave to withdraw the plea it appeared therefrom that the attorney representing defendant on the arraignment, and at the time he pleaded, was inexperienced and unacquainted with the practice in criminal procedure, and for that reason it was claimed failed to make a motion to set aside the indictment before the defendant pleaded. Upon the hearing the court granted the motion for a continuance, but denied the motion to allow a withdrawal of the plea.

As there was no proper showing addressed to the motion to withdraw the plea of "Not guilty" and be permitted to interpose a motion to set aside the indictment—nothing to show that there existed any ground upon which such motion might be based if an opportunity to present it were granted —the order denying the motion to set aside the plea was correctly made. Undoubtedly a defendant has a right, notwithstanding a plea of not guilty is interposed, to move at any time prior to the trial for leave to withdraw it for the purpose of demurring or moving to set aside the indictment (*People v. Villarino*, 66 Cal. 230, [5 Pac. 154]), but he has no absolute right upon motion to have the order made, and whether it shall be granted or not is a matter resting in the discretion of the court, to be exercised upon proper and sufficient showing, and it cannot be said that such discretion is abused where a bare motion to be permitted to withdraw the

plea and attack the indictment is presented without any suggestion or showing that, if granted, the defendant has any grounds whatever upon which to base the motion which he claims he desires to interpose. It would be an idle act upon the part of the court to further delay the trial of a cause which has advanced so far as to have the plea of the defendant entered, by granting a motion to withdraw that plea and permit an attack upon the indictment, without any showing at all that valid, reasonable, or even any disputable, grounds existed upon which an attack could or would be based. While inexperience of counsel may supply a reason why the motion to set aside was not made before the plea of defendant was entered, it in no wise tends to show that there then existed any grounds upon which a motion could have been based had he been more experienced in criminal procedure. The showing of inexperience should have been supplemented by some showing by affidavit of the existence of facts or grounds upon which a motion to set aside the indictment could have been based had his counsel been advised of the legal right of defendant to do so, or at least by proffer for filing of a motion to set aside the indictment upon specified grounds should the motion to withdraw the plea be granted. As no affidavit was presented and no proffer made, there was hence nothing to indicate that any grounds existed upon which to predicate a motion should the plea be withdrawn, and under these circumstances there was no abuse of discretion on the part of the court in denying the motion for leave to do so.

The motion of March 27, 1905, having been properly denied, the defendant, through the same counsel who had presented the original motion, but without any leave or permission of the court to do so, on April 27, 1905, again moved the court to permit the withdrawal of defendant's plea and for leave to file a motion to set aside the indictment upon a number of specified grounds. The motion was based upon affidavits setting forth that certain of the grand jurors participating in finding the indictment against defendant were biased and prejudiced; that others were not citizens of the United States; that others were not on the assessment-roll, and also setting forth other grounds as a basis for the contemplated motion to set aside. It was also accompanied by a prof-

fer of a motion to set aside the indictment upon .all these grounds.

We are not advised, from anything appearing in the briefs of appellant, where he found authority in law warranting him in making this second motion. Possibly the court upon application could have permitted the defendant to renew his motion, but we know of no rule of procedure which entitled the defendant as a matter of right to renew it. Independent of this, however, the affidavits which accompanied the second motion do not show that counsel and the defendant were not fully advised of the existence of all the facts recited in their affidavits accompanying the renewed motion when the original motion was made; nothing to show their inability to present these facts upon that motion. For all that appears upon the renewed motion and affidavits accompanying it, the defendant and his counsel were in possession of all the facts when the first motion was made as ground for setting aside the indictment urged on their second application. Not a particle of excuse, if any existed, is suggested why they did not then present them. In the absence of any showing by counsel of ignorance of the facts upon which the second motion was based when they made the first one, it is only reasonable to infer that they knew of their existence, and that by failure to present them at that time they waived them. Treating the second motion as in the nature of an application to set aside the previous order and to allow an additional or further showing, the refusal of the court to do so cannot be said to be error. As the granting of a motion to set aside a plea is discretionary with the court, if on the original application there is nothing at all to warrant the order then applied for, or such weak showing as to justify its refusal, it cannot be said to be an abuse of discretion to refuse to set aside the order so as to allow another different or additional showing. If such a rule could obtain, the right of counsel to renew such motions and predicate error upon their denial would be unlimited and unrestrained. Of course no such right exists. For these reasons the second application was without warrant and properly denied.

As to the denial of the motion of defendant for a change of venue: The affidavits on this motion were directed to the point whether defendant could obtain a fair and impartial trial in Amador County where the alleged crime was commit-

ted. Those presented on the part of the defendant tended to show such a general prejudice existing in that county against him that he could not; those on the part of the prosecution tended to show that no prejudice existed sufficient to preclude him from having a fair trial. We think from a perusal of the affidavits, without detailing the facts disclosed by them, that the defendant made a very strong showing in support of his motion, but upon settled principles of law we do not think that he is in a position to claim any error in the action of the court in regard to it. When the motion was made the court did not make final disposition of it, but denied it temporarily, saying: "The rule involved has been in existence in this state from the 9th California down to the present time—nearly an unbroken line of authorities—and is to the effect that the court may compel, if it so desires, at least an attempt to draw a jury before passing upon a matter of this kind finally. . . . The order of the court is that the motion for a change of venue be denied temporarily. You understand, of course [addressing counsel for defendant], that the denying of the motion temporarily means that hereafter if it develops that there is any ground for it the court will entertain the motion again."

Of course counsel were familiar with the case referred to by the court,—*People* v. *Plummer,* 9 Cal. 298,—and the subsequent cases of *People* v. *Goldenson,* 76 Cal. 328, [19 Pac. 161], and *People* v. *Fredericks,* 106 Cal. 554, [39 Pac. 944], holding that it is no error for the trial court to postpone the consideration of an application for a change of venue until an attempt is made to impanel the jury, where leave is granted to counsel to renew his application if the facts disclosed on the impanelment should further warrant it, and that where counsel fails thereafter to renew his motion, he cannot claim that error was committed by the court in failing to order a change of venue. In those cases it was held (notably in the latter case) that the failure to renew his motion, where it was denied temporarily only, was an abandonment and waiver of the whole question, and fatal to any claim based upon the original application. In the case at bar no ultimate disposition of the motion was made, and defendant was accorded the right to subsequently renew his motion. He did not do so, and he cannot, within the rule of the above cases, now

insist that the court erred, when his right to move was only postponed, and he did not see fit to avail himself of his opportunity to subsequently renew the motion.

Having disposed of these objections we now come to a consideration of the principal point insisted upon by appellant, that the verdict was not warranted by the evidence.

Giving a general outline of the evidence, preliminary to a particular consideration of it when we reach the salient points in the case, it appears that defendant, a physician, and his wife, a trained nurse, took up their residence in Amador City, in 1902, where defendant engaged in the practice of his profession. In June, July, and August of 1904 there was an epidemic of typhoid fever in that city, and defendant was employed ·professionally in many cases growing out of it, his wife assisting him in the care of his typhoid patients. In August of that year, while nursing a little girl suffering from that disease, his wife was taken ill—it is claimed on the part of the defense from an attack of typhoid fever, a matter which will be considered later—and took to her bed on the 14th of that month. Next morning defendant employed a Mrs. Reeves as housekeeper, and on August 17th engaged Miss McCarthy, a professional nurse, to take charge of his wife, called Dr. Gall, of Amador City, into consultation, and at the time Miss McCarthy came as nurse called in Dr. Quinn, who prescribed for her and attended her thereafter until the morning of August 29th. On August 30th, Mrs. Staples having become somewhat convalescent, discharged Miss McCarthy as nurse, telling her that as Dr. Quinn was not coming any more she thought she could also dispense with her services. The nurse left, and Mrs. Reeves thereafter regularly attended to Mrs. Staples. During the night, after the nurse left, Mrs. Staples became worse; nervous, with a slight rise in temperature, which increased as the night advanced, so that about the middle of the night defendant was required to call up Mrs. Reeves, who had retired, to assist him. Enemas having been administered by the defendant, Mrs. Staples became apparently stronger and better, in which condition she remained practically during the daytime of the 31st and until about 7:30 in the evening. At that hour, while defendant was in the yard, Mrs. Reeves called him, saying that his wife was worse. When he entered the sick-room he

found her very weak and in a semi-conscious condition. He sat down beside her bed, felt her pulse, and immediately reached up to the bureau for a whisky-glass which was resting there, containing a colored liquor, which he administered to her little by little with a spoon, and then placed the glass back on the bureau. She did not rally or become conscious, and about a quarter past eight died.

Within a little over an hour after her death her body was embalmed by John Daneri, an undertaker and embalmer of Amador City. He was sent for by defendant to prepare the body for burial. Nothing was said to him by defendant about embalming the body, only to prepare it for burial, and this he proceeded to do, as he says, in his own way. He opened the femoral artery in the right leg and injected into it in the direction of the heart two quarts of embalming fluid. The body was still warm while the fluid was being injected, and there was no impediment, after the fluid started, to its flow through the artery; the flow was continuous and unimpeded, until the required quantity was injected. Daneri, when he came to the house, had asked the defendant if he intended shipping the body east, and receiving a reply in the negative, had given simply an arterial embalmment. No puncture of the stomach nor any of the organs of the body was made, nor was there directly injected therein any embalming fluid, a process which the embalmer said he would have employed had the defendant intended to send the body away. The embalming fluid used consisted of chloride of zinc, bichloride of mercury, alum water, arsenic, formaldehyde, and salt. The body of deceased was buried in one of the cemeteries in Amador County. The defendant remained in Amador City for a month subsequent to the death of his wife, disposed of his property in that place, and in the latter part of September left for San Francisco, where he opened an office in the Galt House in that city.

Immediately prior to the time when defendant's wife was taken ill he had built a house in Amador City, which they occupied at the time of her death. Near them resided a family named Hoxie, consisting of husband and wife and young daughter. On September 13th Mrs. Hoxie deserted her husband and child, and subsequently went to live at the Galt House with the defendant, as his mistress. This conduct

on the part of the defendant doubtless awoke the indignation
of the residents of Amador City against him, and generated
a suspicion as to the cause of his wife's death. At least in-
vestigation was put on foot to determine it, and on the 18th
of October, 1905, the body of Mrs. Staples was exhumed and
an autopsy held. The exhumation was made by Daneri, the
undertaker who had embalmed and buried the body, and it
was found in an excellent state of preservation. The autopsy
was held about the center of the cemetery, a hedge surround-
ing the place precluding any observation from the outside,
and was made by Doctors Gall and Endicott, physicians of
Amador County. As to that examination, the testimony of
Dr. Gall was quite general. It was to the effect that he
examined all the vital organs of the body except the interior
of the stomach, and could find no apparent cause of death;
that he examined internally about two feet of the intestines
in the vicinity of the iliocæcal valve and found no indica-
tions of any disease from such examination. Dr. Endicott
testified with more particularity. He stated that they ex-
amined the brains, heart, kidneys, liver, intestines, and all
the vital organs of the body; used the knife and made their
examination with the naked eye; examined the intestines
externally throughout their full course, and internally for
about two feet above and below the iliocæcal valve; that
neither of them made any chemical tests or microscopic ex-
aminations, nor did they take any cultures. They removed
the stomach, sealed it, and sent it to Price & Son, chemists
in San Francisco, for examination and report. Thomas Price,
of that firm, an analytical chemist and toxicologist of large
experience in his profession, made tests to discover the pres-
ence in the stomach of veratrum viride, strychnine, or arsenic.
The stomach, when opened by him for that purpose, was
entirely empty, containing no fluid—simply a moisture, and
no solids. He first tested for veratrum viride and then
strychnine, but found neither of these two compounds. He
then tested for arsenic, and the test disclosed the presence of
1.26 of a grain.

So much for the general facts in the case.

The theory of the prosecution is that the death of Mrs.
Staples was occasioned by the administration to her by de-
fendant of veratrum viride or arsenic, or both.

The evidence as to these matters was, it may be said, almost entirely circumstantial, and consisted of the testimony of experts called upon both sides, whose opinions as to the essential facts in the case were at radical variance.

At the outset it may be said, that there is no room for doubt but that the illness with which Mrs. Staples was prostrated on the 14th of August was typhoid fever. This is abundantly shown from the evidence, not only of the defendant, but of disinterested witnesses who were actually in attendance on her, and whose testimony and opinions in that respect are not questioned. It was established by the testimony of the trained nurse, by Dr. Quinn, who was attending physician from the time of her illness until two days before her death, and by the testimony of Dr. Gall, one of the autopsy physicians who had been called into consultation with defendant when his wife first took ill, and diagnosed her case as one of typhoid fever. It was further confirmed by the testimony of experts on the trial, who declared that some of the symptoms specified were marked evidence that the disease was typhoid fever. However, we do not understand this to be contested by the prosecution, its position being that, though the disease with which Mrs. Staples was prostrated, was typhoid fever, yet that disease was not the cause of her death; that her death was caused by the poisons specified, administered by defendant while she was suffering from that disease.

Now, as to the evidence that the death of Mrs. Staples was occasioned by either of these poisons, and, first, as to the claim that it occurred from veratrum viride. Half an ounce of that drug contains, as testified to by the druggist who sold it, about 580 drops, and would not fill an ordinary whisky glass quite one half full. The druggist who sold it testified that veratrum viride is of a reddish brown color and translucent. The official dose of the drug is from two to five drops, and the evidence shows that anything over that might be fatal, and in some cases it might take thirty drops to cause death. The only evidence in the case upon which the theory of the prosecution can be based with reference to the administration of veratrum viride is that in the afternoon of the day upon which Mrs. Staples died the defendant purchased it, and when she became semi-conscious before her death he adminis-

tered to her from a glass a liquid which had the appearance
of veratrum viride. There is nothing else in the evidence
to indicate poisoning from this drug. Neither the autopsy
nor the chemical analysis of Dr. Price revealed its presence
at all in the body of deceased, nor was there any evidence of
any clinical or pathological symptoms or conditions indicating
that death had been occasioned from it. On the contrary,
as to these symptoms and conditions, the direct evidence, if
it does not show that she did not die from the effects of
veratrum viride, at least very strongly indicates that she did
not, and the preponderance of the expert evidence tends to
confirm this conclusion. The purchase by defendant of ver-
atrum viride was not, of itself, an incriminating circumstance.
As to that purchase the defendant testified that, "about four
o'clock in the afternoon (August 31st) I felt of her pulse and
examined her thoroughly. This rapid pulse gave me a sug-
gestion of the disease of uræmia, which I have known to follow
cases of typhoid fever, and led me to examine Mrs. Staple's
urine; I found the urine contained albumen, and this strength-
ened the theory that uræmia might set in as a complication.
In uræmia with convulsions I always use veratrum viride,—
tincture of veratrum viride, and in order to be prepared for
this complication, if it arose, I went to the drug-store about
five or a little after, and purchased one half ounce of veratrum
viride." He purchased it at the drug-store where he was
accustomed to deal, and the druggist testified, as did the
defendant, that when the defendant entered the drug-store
and asked for the tincture of veratrum viride, the former
inquired of him how Mrs. Staples was; the defendant said
she was worse, and that he wanted the tincture of veratrum
viride for her. The druggist asked if he should label it,
and defendant answered, "Yes, you had better, because I
might want it for some of my other patients." These are
the conditions and circumstances under which the purchase
was made; openly, and with the declared object for which it
was purchased. The undisputed medical testimony in the
case shows that while poisonous when administered in exces-
sive doses, tincture of veratrum viride is a well-recognized
official drug, administered principally in cases of uræmic con-
vulsions which sometimes arise in cases of typhoid fever. So
that as far as the purchase of the drug is concerned, under

the circumstances detailed,—to meet possible complications in Mrs. Staples's case,—it not only appears that the drug was a proper remedy, openly purchased for the purpose the defendant claimed and desired it, but as a physician, fearing the complications he indicated, it was his professional duty to get it and give it should they arise. Defendant testified that the complications he feared did not arise, and he did not administer any of the drug to his wife.

It is insisted, however, that the liquid was administered when Mrs. Staples was in a semi-conscious condition. This is the time when it is claimed by the prosecution that it was given—at about 7:30 P. M., and that the liquid administered at that time was veratrum viride. But that the liquid administered then was this tincture is, under the evidence, purely conjectural. The defendant testified that the liquid he then gave his wife was whisky and water. Mrs. Reeves, who was present when he was giving it, testified that the liquid was in a small whisky-glass, and had the appearance of whisky and water. It was given without any secrecy, in the presence of the housekeeper, and it is not contended that whisky or water in her then condition was not a proper stimulant to give her.

Now, as to the clinical symptoms and pathological conditions.

Dr. Morgan, a physician and chemist and toxicologist of many years' experience, called on behalf of the defense, testified: "Veratrum viride, when taken in poisonous doses, acts upon the system, first, the same as mustard and water, it being a powerful irritant. It irritates the lining membrane of the stomach and causes vomiting. After that, if it is absorbed into the system, the patient becomes depressed, becomes weak, and is covered with a cold perspiration. In case that death follows veratrum viride poisoning, it is not until quite a time after the administration of the drug. The shortest time in which death has occurred following veratrum viride poisoning being thirteen hours, and it has been prolonged until death has occurred, twenty-four hours after having taken the dose. . . . The first symptoms of veratrum viride taken in poisonous doses is the irritation of the stomach and vomiting." Dr. Endicott for the prosecution testified that, "the symptoms of veratrum viride, when given in poisonous doses, is a partial collapse, then slight pulse, usually covered with

a cold perspiration, and as a usual thing suffering from nausea. Vomiting does not frequently accompany it, but if taken internally vomiting would accompany it in a large majority of cases, but not immediately; sometimes produces intense burning in the stomach.''

This is a fair embodiment of all the testimony in the case as to the effect of. veratrum viride upon the stomach when administered in poisonous doses. From it it appears that veratrum viride is a slow poison, and that death would not result from it within at least thirteen hours after it was given. This is the only evidence in the case as to the time within which death would earliest ensue. Defendant obtained the drug about five P. M. Assuming that he administered it, or commenced doing so, immediately after obtaining it (which is not claimed), still, as Mrs. Staples died at 8:15 P. M., it would appear from the only expert evidence on the subject that a sufficient time (three hours and a quarter) had not elapsed for the poison to have occasioned her death. Respondent insists that, owing to the weakened, debilitated condition of Mrs. Staples, the administration of a poisonous dose of veratrum viride, administered at the time it is claimed it was (7:30 P. M.), would cause death in a much shorter time than if administered to one in good health. This may or may not be true. Whether veratrum viride in poisonous doses would operate more speedily on Mrs. Staples, on account of her debilitated condition, so as to cause her death, and within what time it would so operate, were pertinent and essential matters of proof in the case, and neither jury, counsel, nor this court can indulge in a speculation on the subject contrary to the only evidence in the case upon that point. But aside from this, there was an absence of the symptoms which accompany poisoning from veratrum viride. There was no vomiting. This is testified to by the defendant, but, laying his testimony aside, it is also testified to by Mrs. Reeves, the housekeeper, who was present from the time the liquid, which is claimed by the prosecution to have been veratrum viride, was administered until Mrs. Staples died. Whatever may be said of the testimony of the defendant, the integrity of Mrs. Reeves as a witness, and the accuracy of her observations in the sickroom, are not questioned. She testifies that during that period there was no vomiting, and the evidence clearly shows that

at no period during Mrs. Staples's sickness was there any. To meet this testimony, it is again insisted by respondent that the slight vitality of Mrs. Staples prevented the exhibition of these symptoms. But it nowhere appears from the evidence that this debilitated condition would prevent this characteristic symptom of the poisoning from appearing. No witness testifies that it would, but, on the contrary, all testified that it is a symptom which will appear. The position of counsel seems to be that while the death of Mrs. Staples was occasioned by the administration of the poison, yet before the symptoms showing that she was so poisoned appeared she died. Whatever merit there may be in this position, nothing in the evidence in the case furnishes any basis for it being taken. If she was poisoned by veratrum viride, the expert evidence shows that this symptom of it would have manifested itself; as it did not, it is evidence strongly tending to show that she was not so poisoned.

We now come to the autopsy, and will consider its bearing, first, on the matter of poisoning by veratrum viride. The exhumation of the body was forty-eight days after death. As to the autopsy itself, the testimony of the two autopsy physicians is that they found no pathological or diseased condition sufficient in their opinion to account for the death of Mrs. Staples; there was no apparent cause of death that they could ascertain, which, of course, must be taken to include that they did not find any evidence of poisoning by veratrum viride or any other poison. Professor Price, the chemist, to whom the stomach was sent, testified that as far as veratrum viride was concerned, he found no evidence of its presence in the analysis of the stomach which he made. This evidence, if the presence of veratrum viride could have been discovered by an autopsy, or by chemical test after death, would be almost persuasive proof that veratrum viride had not been administered to the deceased. To meet this, however, the prosecution introduced the evidence of the autopsy physicians, testifying as such, and not as chemists or toxicologists, to the effect that veratrum viride being a vegetable drug, if administered, all traces of it would disappear between two and three weeks after death. To be specific, Dr. Endicott was asked: "Q. How long after it (veratrum viride) would be administered could it be found?—A. It could not be found any great

length of time after death in my opinion, because it is a
vegetable compound; it would decompose.—Q. How long
would it take this particular drug to decompose, being a
vegetable matter, after being administered?—A. I could not
state a definite period of time.—Q. Well, can you give about
the time?—A. Well, I should say in two weeks anyway, that
there would not a trace be found." On the subject Dr. Gall
testified: "Q. How long would it take, being a vegetable drug
—how long would it take to decompose?—A. Well, I don't
know; it is a difficult question to answer; it would depend a
good deal.—Q. Just about?—A. Oh, about two or three weeks
I should think." · And on cross-examination he stated: "I
never saw any one die from it [veratrum viride]. I never saw
any sample that would demonstrate to me that it would· de-
compose or disappear in two or three weeks; only say from
my own general knowledge, because when decomposition sets
in generally those vegetable properties decompose. . Well, you
would allow about two or three weeks for decomposition to
start, that is all; there was a certain amount of decomposition
in this body. But for a body that had been buried seven
weeks it was remarkably well preserved; no evidence of
decomposition in the heart."

Now, it will be observed from this testimony that the
evidence of the physicians as to inability to detect the pres-
ence of veratrum viride poisoning in a body proceeds upon
the theory that veratrum viride in their opinion is a *vegetable*
drug and disappears with the decomposition of the body;
otherwise, it could be detected. But there was no evidence that
the body was decomposed at the time of the autopsy, or that
decomposition had set in. Dr. Gall's own evidence largely
negatives that proposition, and the testimony of Daneri, the
embalmer, is that when he exhumed the body for the autopsy
it was just as natural as the day he put it down and buried
it; almost petrified; that to the touch it was like putting your
finger on a piece of iron. If, then, the only reason why ver-
atrum viride, if administered, could not be discovered in
a dead body would be because decomposition had set in, as
it had not set in on the body of deceased, there was no reason
why a proper examination or analysis to discover it would
not have revealed its presence.

The evidence of the autopsy physicians is the only evidence

in the case that veratrum viride disappears within a few weeks. In fact, this testimony and that of the two following witnesses is the only evidence on the point.

Professor Price, the chemist and toxicologist, testifying as to his analysis of the stomach, was asked whether veratrum viride administered fifty days prior to an autopsy could be discovered in then making an analysis of the stomach, to which he responded: "I have no personal experience myself to enable me to say how long this veratrum viride will remain in the stomach after death, and from all my investigation among the authorities they are silent on that subject." He also designated veratrum viride as an alkaloid. Dr. Morgan, a physician, and also a chemist and toxicologist of experience, testified that, "there is no evidence upon which we can base a positive opinion as to how long veratrum viride taken into the stomach would remain before decomposition would set in; it is an alkaloid; morphine will remain in the human body one or two years after death, and strychnine as long as ten years. Morphine, strychnine, and veratrum viride are all alkaloids, and we could reasonably expect to find them in the body for a period of a year or two, any one of the three."

Before proceeding to a further consideration of the case, it is proper at this point to say that when the defendant was on the stand he did not state, nor did his counsel make inquiry of him, as to what had become of the veratrum viride which he purchased. This, doubtless, was an oversight on the part of defendant's counsel, and, at best, only shows that he did not account for it. His failure, however, to testify on direct examination on this subject did not preclude the prosecution from making inquiry in that direction, if it so desired; hence, it was a possible oversight on the part of both the defense and prosecution that the subject was not gone into.

We do not think that any further discussion of the evidence upon this branch of the case is necessary, and without commenting upon it further than we have, we now pass to a consideration of the evidence bearing upon the claim of the prosecution that the deceased came to her death from arsenical poisoning.

This branch of the case, in our judgment, requires less discussion than we have devoted to the claim of poisoning by veratrum viride. There is no evidence that defendant had

July, 1906.]    PEOPLE *v.* STAPLES.    423

procured or had in his possession any arsenic. As a physician
he may have had it, but there is no proof that he did. Neither
at any time during her illness did Mrs. Staples exhibit any
symptoms of arsenical poisoning. As to those symptoms there
is no dispute. Dr. Morgan testified: "The first symptoms
of arsenical poisoning is a burning sensation in the throat
and stomach and an intense desire for water; then follows
vomiting, which is so severe that it cannot be controlled, the
patient constantly desiring water, and as often as it is given
constantly vomiting it. After that we usually find a diar-
rhœa, and the vomiting becomes streaked with blood; the
diarrhœa is of a peculiar character known as the rice water
stools and contains patches of mucous membrane from the
intestines. The patients, if they die, usually die in from six
hours to two days."

Dr. Tiffany said: "Arsenic irritates the lining membrane
of the stomach and intestines, and it creates more or less
vomiting and purging, running off condition of the bowels.
Vomiting takes place when it is used beyond physiological
action to a poisonous extent. As soon as there was enough
irritation of the stomach. The administration or receipt of
arsenic in poisonous doses in the stomach would cause irrita-
tion within a few hours. In the case of taking by the mouth
of arsenical poisoning, the irritation would leave on the in-
ternal organs a congested condition, an aridness, an inflamed
condition. . . . If one poisonous dose was administered at
a time it would produce vomiting."

The sickness of the deceased covered a period of over two
weeks, and there is no evidence whatever that at any time
the symptoms attending arsenical poisoning exhibited them-
selves. There was no vomiting or purging. Neither did the
autopsy or the chemical analysis of the stomach show any
irritated condition of either the stomach or of any other
internal organ of the body. Arsenic, it is true, was found in
the stomach. But the evidence shows that its presence there
could have resulted through the process of embalming, and, as
far as the evidence on that point is concerned, it is quite
apparent that it did. There is only one witness—Dr. Morgan
—who testifies upon this subject. Professor Price, who made
the analysis, nowhere says (and there is no pretense that any
other witness testified on the subject) that it could not have

gotten into the stomach as the result of embalming. The most that can be claimed for his testimony (which is the deduction that the prosecution arrives at from it; but not what the professor said) is that as the chemist did not find chloride of zinc, bichloride of mercury, formaldehyde, or alum, but only arsenic, in his analysis, that therefore the arsenic could not have gotten into the stomach from the embalming fluid; that if it did, the other ingredients of the fluid would also be found there. The professor did testify that he found no chloride of zinc or bichloride of mercury, but did not say why he did not find them. He testified also that he found no trace of formaldehyde or of alum, but the reason for this, as he says, is because he did not look for them. As to the presence of arsenic in the stomach, he did not testify that it could not have gotten into the stomach from the embalming fluid. His only testimony on that point was that he found there the quantity of arsenic stated.

Dr. Morgan, an equally reputable chemist, stated his belief that the arsenic in the stomach came from the embalming fluid, and in addition said: "My experience has taught me to believe that it is impossible for an organ in the human body to be within a few inches of embalming fluid for the period of forty-eight days without absorbing some of the arsenic. The embalming fluid injected into the right femoral artery would travel up the femoral artery a few inches and reach the aorta, which is the largest artery in the body, and being mixed with blood would pass on up to the heart. Now, the stomach lies right over the aorta, not being separated from the interior of the aorta by more than an inch, and it would only have to travel that small distance of tissue in order to reach the stomach." He further testified, giving his reasons therefore, which space prevents quoting, that it was possible for arsenic to pass from the embalming fluid to the stomach without the chloride of zinc or bichloride of mercury showing itself there; that arsenic when injected into a dead body will commence diffusing itself through the tissue at once, which the other salts will not immediately commence to do, nor will they, "until such time as the body turns to liquid," when they will also travel. In addition to this he made an experiment with the embalming fluid of Mr. Daneri upon the stomach of a deceased person, which actual experiment confirmed the

opinion he entertained and expressed. The opinion of Dr. Morgan with respect to these matters was not disputed by any medical or other opinion given in the case. So much for the evidence relating to arsenical poisoning.

In addition to these particular facts relative to the claim of the prosecution that the death of deceased was occasioned by poisoning there was other evidence, to be referred to generally.

Reputable expert physicians testified that the autopsy made by the autopsy physicians was incomplete, and was not sufficient to determine whether the deceased had died from typhoid fever or not, while the same physicians testified that from the symptoms attending the sickness of deceased, they were satisfied that she had died of typhoid fever. It was further shown by the evidence of disinterested parties that defendant and his wife had lived happily together, and that during her illness he treated her kindly, and seemed to do everything that he could to help her and alleviate her sufferings.

This is as far as we deem it necessary to state the evidence in the case. We do not concern ourselves with many suggestions, more of an argumentative character than otherwise (but even as such quite cogent), made by counsel for appellant which he claims are inconsistent and incompatible with the theory of the prosecution that the death of deceased was occasioned through poisoning. We content ourselves with the evidence as we have stated it, which in our judgment, did not warrant the verdict of the jury.

It will be perceived that the evidence in the case relied on to establish the guilt of the defendant is practically circumstantial, and it is elementary law that where the evidence is of such a character it must be not only consistent with the hypothesis of guilt, but inconsistent with any other rational hypothesis. The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court. The prosecution has the burden of proof. The defendant is presumed innocent until the proof satisfies the jury beyond a reasonable doubt of his

guilt. The right of a jury to return a verdict of guilty is not an arbitrary right. The sufficiency of their verdict must be tested by determining whether the evidence upon which that verdict is framed was of such a character that they could say from it that in their judgment no reasonable doubt of the defendant's guilt existed. Now, considering the evidence in the case at bar under these elementary rules of law, there was no proof in the case that the wife of defendant died from arsenical poisoning; in fact, the evidence is not only consistent with the claim of defendant that she did not, but it may be said that the preponderance of evidence in the case is to the effect that she did not. As to poisoning by veratrum viride: Aside from the opinion of the experts that Mrs. Staples died of typhoid fever, from which she was concededly suffering, the clinical and pathological conditions tend to show that she did not die from the administration of that poisonous drug. The only evidence at all as to veratrum viride is that the defendant got it, and that he administered to her a liquid which looked like it. The most that can be said of his particular evidence is that it might have been sufficient to have raised a suspicion in the mind of the jury that he did administer it. Certainly it was not effective for any other purpose. This, however, could only be a suspicion, and no jury have a right to declare forfeited the life of a defendant upon mere suspicion. Especially is this true when the facts upon which the suspicion might have been generated are entirely consistent with innocence; and could exist without the defendant being guilty of the heinous offense of which he is accused. No man can be convicted of murder upon evidence which, at best, leaves the question of criminal agency in causing death, if not reasonably doubtful, at least merely conjectural.

We are not unmindful of the claim of the prosecution that there existed a motive for the death of Mrs. Staples; a desire on the part of defendant to get rid of her so that he might enjoy the society of Mrs. Hoxie. Assuming (which the evidence does not clearly show) that a meretricious relationship between them existed prior to Mrs. Staples's death (the evidence is clear enough of its existence a month afterwards), and giving to the claim of the prosecution the full force which such a relationship or desire might disclose, still this of itself

was not sufficient to warrant the conviction of the defendant. It is a circumstance to be taken into consideration by the jury, but not sufficient of itself to warrant a conviction. A motive being shown, there must still be evidence of the fact of death by poisoning established to a moral certainty, and conceding that there was sufficient proof upon which the jury could deduce a motive in this case, still, as we have endeavored to point out, the evidence was otherwise insufficient to prove the *corpus delicti;* it was entirely insufficient to warrant the jury in finding to a moral certainty that deceased died of poison administered by the defendant. Motive, while a potent factor in the sum of evidence proving guilt, is not in itself sufficient to sustain a conviction in the absence of other proof tending clearly to show criminal agency on the part of defendant causing death.

The same may be said of what is denominated by the prosecution evidence of the flight of the defendant. No doubt but that the jury had the right to consider this evidence, and its potency was for their determination. That evidence, however, simply amounted to this, that a month after Mrs. Staples's death defendant took up his residence in the Galt House in San Francisco with Mrs. Hoxie; that he had his office for the practice of his profession there, and his professional sign prominently displayed; that on October 22, 1905, Mrs. Hoxie, being fearful that her husband had discovered her whereabouts, and fearing injury from him, prevailed on defendant to take her away from San Francisco; that they left hurriedly in the night-time and went to Ensenada, Lower California, where defendant engaged again in the practice of his profession under his own name and professional sign; that he remained in Ensenada about two months, and then, in company with Mrs. Hoxie, went back into the country about thirty miles to the ranch of a man named Blackwell, where they were arrested. The evidence shows that the defendant during all these times kept his true name, did business under it, made no effort, as far as these matters are concerned, to hide his identity, and there was no evidence to show that he ever knew till after his arrest that any suspicion existed as to the cause of his wife's death, or that any autopsy upon her remains had been held.

We think we have mentioned every claim of the prosecution

and discussed all the important evidence addressed to each, and our conclusion from a consideration of the whole case is that the evidence as we have recited it did not warrant the jury in the verdict against the defendant, and for that reason the judgment and order denying a new trial must be reversed.

Aside from the contention that the evidence was insufficient to warrant the verdict of the jury, it is insisted by the defendant that the court committed error in its rulings relative to the admission of evidence, in denying challenges to the jury interposed by defendant, and in its refusal to give certain instructions. We think there was no error as to the rulings concerning challenges to the jurors, and as to the particular rulings relative to the testimony of certain witnesses, we do not think they disclose any error.

The court admitted, under the claim of motive, evidence of the destruction of rented premises occupied by the defendant in Amador City in 1902. This evidence was admitted on the theory that it supplied an additional motive for the murder by defendant of his wife because she knew that his destruction of these premises was incendiary, and might have prosecuted him for arson. In our judgment all the evidence was inadmissible. In this regard it is sufficient to say that when this alleged arson was committed the wife of defendant was not in Amador City, knew nothing about the fire, and that the evidence introduced to show arson on the part of defendant wholly failed to prove it. We do not perceive that the court erred in refusing to give the instructions tendered by defendant. They were all substantially given in the charge of the court.

The judgment and order denying a new trial are reversed, and the cause remanded that a new trial may be had.

Henshaw, J., Angellotti, J., Shaw, J., Hall, J., and Sloss, J., concurred.

NOTE.—Justice McFarland being unable to act, Justice Hall, one of the justices of the district court of appeal for the first appellate district, participates herein *pro tempore*, pursuant to section 4 of article VI of the constitution.