[Crim. No. 518. Fourth Appellate District.—January 26, 1939.]

THE PEOPLE, Respondent, v. CHRIS KRUSE, Appellant.

Tom Okawara and Milo Popovich for Appellant.

U. S. Webb, Attorney-General, and Eugene M. Elson, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was charged with the crime of manslaughter in connection with the death of one James Jackson. He was found guilty by a jury and has appealed from the judgment and from an order denying his motion for a new trial.

The appellant concedes that Jackson died as the result of a blood clot caused by a fractured skull, but earnestly contends that there is no evidence to connect him with the fatal injury. From the testimony of two eyewitnesses it appears that at about 10 o'clock P. M. on June 28, 1938, the appellant had some sort of an argument with Jackson, who was a colored man, in front of a cafe on a street in Fresno. One of these witnesses testified that "the colored guy didn't want to fight"; that the appellant "backed him up"; that all at once the appellant hit Jackson in the jaw and knocked him down; that when hit Jackson's hands were hanging down at his side; that Jackson was assisted to his feet but was staggering; that the appellant then hit him again in the jaw and he fell over backwards; that the "back of his head" hit the pavement; and that he "didn't wake up no more". Both of these witnesses testified that you could hear Jackson's head hit the sidewalk, one of them saying: "It hit pretty hard. You could hear it."

Someone assisted Jackson to the curb and when the ambulance arrived, some five or ten minutes later, he was able to enter it and was taken to the emergency hospital, where he walked in and "laid down" on the table. A nurse dressed a laceration over his right eye after which he was taken to the police department and then allowed to go. The nurse testified that she saw no other injuries, that Jackson complained of none, and that he left the emergency hospital about 10:30 P. M. Another witness testified, through a deposition, that at about 11 or 11:30 o'clock that night he saw Jackson drinking what he thought was wine in a place

about a block from where the fight had occurred, that he asked him how he felt, and that he replied: "Pretty good."

So far as disclosed by the evidence Jackson was next seen about 2 o'clock A. M. on June 29, 1938, partially undressed, lying on his back across the bed in his room at a hotel some six or seven blocks from where the fight occurred. The manager of this hotel also observed him in this position at about 8 o'clock that morning and again at 2 o'clock that afternoon. At about 8 o'clock that night the manager, again noticing that he had not changed his position, went in and attempted to rouse him, without success. He called an ambulance and Jackson was taken to the general hospital, where he was admitted about 10:30 o'clock P. M. on June 29, 1938, and he died without regaining consciousness about 10 o'clock the next morning.

The doctor who examined Jackson after his admission to the hospital and two doctors who performed an autopsy testified, and pictures of the skull of the deceased were admitted in evidence. All three doctors agreed that death was caused by a blood clot on the brain following a skull fracture. From the testimony of these physicians it appears that there was nothing on the outside of the head to indicate the existence of this fracture and that the only laceration on the head which could be seen was one over the right eye. One of the doctors described the fracture as being "above the right ear, extending back across the base of the skull and over down to about the lower portion of the opposite ear". At a point above and slightly back of the right ear the fracture divided into two lines so that the entire fracture is described as having the form of an "inverted Y". All three doctors testified that this fracture could have been caused by a fall on the sidewalk; that it could have been caused by being struck with a blunt instrument or by a stick of wood; and that a person receiving such an injury could walk around. One doctor testified that as between a fall on the sidewalk and being struck with something it was more likely that the latter would have caused more laceration. He further testified that a person with such a fracture would have constant pain so long as he remained conscious; that he might live for three or four days, depending upon how long it took to form a blood clot with sufficient pressure against the brain; and that a man might

receive such a fracture and walk around for several hours before lapsing into unconsciousness. Another doctor testified that it would be possible for a man with such a fracture to live thirty-five or forty hours, and under some circumstances even longer; that he probably would have a headache; that drinking liquor would probably hasten the formation of the blood clot; and that he would be able to walk around and climb stairs until the pressure of the blood clot on the brain reached a certain point. The doctors also testified that one tooth was missing from Jackson's jaw and that there was evidence that its removal had been recent.

The appellant testified that he had formerly been a prize fighter; that he was in a cafe where the people were talking about the Louis-Schmeling fight; that he heard Jackson say that now the colored people would be "as good or better than the whites"; that he then told him "Well,—here is one Schmeling you are not going to knock out, or any other colored man"; that Jackson then "rushed me out the door"; that Jackson then struck him with his left hand and he hit Jackson three times and walked away and did not stop to see whether or not Jackson fell; and that he struck him twice on the face and once on the body.

■ The appellant contends that the evidence is not sufficient to sustain the judgment in that there is no evidence to connect the cause of death with any act upon his part. The main argument is that the uncontradicted testimony of the eye witnesses is to the effect that the deceased, when he fell to the pavement as the result of a blow from the appellant, struck the back of his head as distinguished from the right side of the head, whereas the uncontradicted testimony of the physicians is that the impact which caused the fracture was on the right side of the head and above the right ear. It is argued that these facts conclusively prove that Jackson must have received another blow above his right ear, between the time he left the police station and 2 o'clock the next morning when he was seen on his bed, which blow resulted in his death. The evidence, however, does not necessarily show the facts relied upon but is subject to a different interpretation and justifies a different inference.

One of the eyewitnesses to the fight testified that Jackson, when hit by the appellant, fell down and hit his head in the back. When asked what part of the back of Jackson's head

struck the sidewalk he replied: "I seen a little cut, a kind of blood, right in here some place." He then indicated a location which is described in the record as "the upper left-hand portion of the back of the head". When asked whether the position was "right on the top of the head", he replied, "Right in here some place." It appears from the testimony of the nurse and doctors, however, that the only cut and blood was just above Jackson's eye. The other eyewitness, when asked where Jackson hit his head, replied: "Oh, I couldn't see very good but I think it was about right in there." He then indicated the position and when appellant's counsel asked him if he was referring "to the back of the head and slightly to the left" the trial judge said: "Of course, he drew his finger across his head to the right-hand side, too, in indicating." The evidence indicates that the eyewitnesses were not too sure about the exact point where the impact occurred, which is not surprising under the circumstances, where parties in a crowd were watching such a fight. While both witnesses were sure that the back of Jackson's head struck the sidewalk their evidence is hardly sufficient to definitely establish that the point of impact was on the left side of the head. From the evidence of the eyewitnesses the jury may well have concluded that the actual point of impact, when Jackson's head struck the sidewalk, was on the right side of the rear half of the head rather than on the left side.

Moreover, all three doctors testified that while you might naturally expect the place where the most fracture appeared, which in this case was over the right ear, to be the point of impact, you could not be sure of the point of impact from the appearance of the fracture, and that the location of the impact could not be told from the location of the blood clot. From the testimony of all three doctors it appears that while the most likely place of impact, in their opinion, was a little above and to the rear of the right ear, it was not possible to say that it was not at another point. It appears, without dispute, that the back of the deceased's head struck the sidewalk as the result of a blow given him by the appellant and it appears from the testimony of the doctors that the fracture which led to Jackson's death could well have been caused by such an occurrence. The matter was not only one for the jury, but the evidence sufficiently sus-

tains its implied finding that the death of Jackson was caused by one of the blows delivered by the appellant. This inference was reasonable in the absence of any evidence that the deceased sustained any other injury during the four hours intervening between his fall and the time he was seen lying across his bed.

It is further argued that Jackson must have received a later injury with which the appellant was not connected because he made no further complaint at the emergency hospital, he was treated only for a laceration over the eye, the nurse observed no other injury, and he made no complaint about any pain when he was seen drinking about 11 or 11:30 o'clock that night. Not only did the doctors testify that a man might walk around several hours without knowing that his skull had been thus fractured, but it appears from their testimony that there was nothing on the outside of the head to indicate any such injury. The doctor who examined him at the hospital testified that it took him a half hour to discover that the skull was fractured and it is not surprising that the nurse at the emergency hospital did not observe it. Her attention was directed to the cut above the eye, which was bleeding, and she made no further examination. Apparently, the man had also lost a tooth but it is entirely natural that he should not have expected or requested treatment for that at the emergency hospital, and it is also natural that having just been engaged in a fight he would desire to say as little as possible while in the hands of the police. The witness who testified that he saw Jackson at 11 or 11:30 that night was impeached by showing that he had been twice convicted of a felony and the jury may not have believed him. If they did believe him, the fact that he was seen at that time is entirely consistent with the testimony of the doctors that a man in that condition could walk around for several hours, although he would suffer some pain or a headache. The amount of pain he suffered may have been effected by the liquor he was drinking and it is not surprising that he told the man who inquired as to how he felt that he felt ''pretty good'' in view of the fact that he had already gotten in trouble that night by talking too much.

The appellant relies particularly upon the rules concerning circumstantial evidence set forth in *People* v. *Lamson,* 1 Cal.

(2d) 648 [36 Pac. (2d) 361], and *People* v. *Staples,* 149 Cal. 405 [86 Pac. 886]. In the latter case it is said: "The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction." The case now before us does not rest entirely on circumstantial evidence and every incriminating circumstance is not equally compatible with innocence. There is direct evidence of eyewitnesses that blows were struck as a result of which Jackson fell backward, his head striking the pavement with such force that the impact was heard by bystanders. From the testimony of the experts this could well have caused the fracture which unquestionably led to the hemorrhage which caused death. These circumstances are not "equally compatible with innocence" and the only possibility of innocence arises from a conjecture that the fracture may have resulted from a later injury from another source. ■ It is argued that the deceased may have fallen on his way home or that he may have been attacked by someone else. There is, of course, no evidence of any such occurrence and while such a thing is possible it cannot, under the circumstances, be said to be reasonably possible. Beyond any reasonable doubt the blows struck by the appellant caused the death of Jackson and the prosecution was neither required to prove this beyond any possible doubt nor to affirmatively establish that a later and independent injury did not take place. (*People* v. *Bellamy,* 109 Cal. 610 [42 Pac. 236]; *People* v. *Black,* 111 Cal. App. 90 [295 Pac. 87]; *People* v. *Breuer,* 15 Cal. App. (2d) 745 [60 Pac. (2d) 162].)

■ The only other point raised is that the district attorney was guilty of prejudicial misconduct in his argument to the jury. In this argument the deputy district attorney, in referring to the appellant, said: "He has been in the penitentiary once, and it didn't do him any good." Counsel for the appellant then assigned this as prejudicial misconduct, stating that while the fact of prior conviction was admitted the same went only to the credibility of the witness. The trial judge stated that the matter went only to the credibility of the witness and instructed the jury that it could be considered only for that purpose. The deputy

district attorney then said: "I say that it didn't do Kid Kopecks any good." Counsel for the appellant assigned this as prejudicial misconduct and asked the court to instruct the deputy district attorney to desist from such tactics. The trial judge then very clearly and carefully told the deputy district attorney that he had no right to make such an argument, warned him to desist, and instructed the jury to disregard what had been said.

While the remarks in question were entirely improper and should not have been made, and while the deputy district attorney was deserving of severe censure for having made them, we cannot feel, under the circumstances of this case, that it can reasonably be said that they may have affected the result. The trial judge clearly and firmly disapproved of the remarks and instructed the jury to disregard them. It cannot be said that the remarks were of such a character that their effect could not have been cured by the court's instructions, and this is not one of those close cases where it may be said that the improper remarks may have led to a miscarriage of justice.

For the reasons given the judgment and order appealed from are affirmed.

Marks, J., and Griffin, J., concurred.