We granted certiorari in this case to determine whether, as the defendant asserts, the Court of Criminal Appeals' judgment affirming the conviction, which was based solely on circumstantial evidence, is in conflict with Alabama case law.
The defendant was convicted of murdering Hilliard D. Smith. At trial, the State proved that Hilliard D. Smith was killed as a result of gunshot and stab wounds. Also, the State proved that the defendant was in possession of various items which had belonged to the victim, and that the defendant was staying a few blocks from where the victim's stolen car was recovered. This was, essentially, the sum total of evidence presented against the defendant.
Over 100 years ago in Ex Parte Acree, 63 Ala. 234
(1879), this Court discussed what was necessary in order to convict a person by the use of circumstantial evidence:
 The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if *Page 788 they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires.
[Emphasis added.]
This is not an antiquated statement of the law, however, as it has been followed throughout the years by this Court and the Court of Criminal Appeals. See Dolvin v. State,391 So.2d 133 (Ala. 1980); Cumbo v. State, 368 So.2d 871
(Ala.Crim.App. 1979).
Thus, if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed. We are of the opinion that, in the case before us, the circumstances are such that the act might very well have been done by someone other than the defendant. Therefore, the conviction must be reversed.
From the testimony of two of the officers who investigated the homicide, one could easily conclude that Horace "Peter Boy" Salter, and not the defendant, was the person who committed the murder in this case. Sergeant Williams testified as follows:
 Q. Officer Williams, are you also familiar with a confession given by Peter Boy Salter of killing Mr. Smith?
A. I'm not familiar with a confession.
Q. The 21st of April.
 A. I'm familiar with a statement that Mr. Salter gave.
 Q. Did Mr. Salter not state on the 21st day of April, 1982, after you read his rights, you and Sergeant Boone and Sergeant Mayo read his rights to him, that he got the typewriter out of a sissy's house across town, that he and a sissy had gotten into an argument and that he had stabbed the sissy with a knife. Do you recall Mr. Salter making that statement on the 21st day of April, 1982?
A. Yes, sir, I do.
 Q. Do you also recall Mr. Salter making the statement after being asked where he got the knife to stab someone, he said out of the kitchen?
A. Yes, sir, I do.
 Q. And when asked did he do anything else to the sissy, he stated, yes, then I shot him. Do you recall him saying that?
A. Yes, sir, I do.
 Q. When he was asked where he got the gun to shoot someone, he stated that the sissy had the gun. Do you recall that?
A. Yes, sir, I remember that.
 Q. When asked what he did with the gun, he stated that he wrapped the gun in a bag and threw it away in the fields, do you recall that?
A. Yes, sir.
 Q. When asked how to get to Mr. Smith's house, he stated that you go down the Avenue and turn by the old theatre and the sissy's house is on the left, do you recall that?
A. Yes, sir, I do.
 Q. When asked what kind of gun was used, what caliber, do you recall him saying he did not know?
A. Yes, sir, I remember that.
 Q. Do you recall him also saying when asked if the bullets in the gun were big or small, that he stated they were small?
A. Yes, sir.
 Q. Do you also remember him stating after you pulled out your .38 revolver and showed him the bullets from that gun, asking him if the bullets he used were smaller or larger or about the same size as your .38 caliber bullets, do you recall him saying they were smaller?
A. Yes, sir, I do.
 Q. Do you recall after he was asked if he engaged in any sexual act with Mr. Smith, do you recall him stating that he did?
 A. There was some questions about it. I don't remember the exact context of that particular question, Mr. Orso. If it's in there, I remember it.
 Q. Okay. So, you do recall after he was asked, did you engage in any sex acts with Mr. Smith, you recall him saying, yes, I did. *Page 789 
 A. If you'll show it to me, if I can read it, I'll give you a definitive answer.
(Pause.)
A. Yes, sir.
 Q. Okay. Do you also recall after Mr. Salter was asked if any kind of lubricant or grease was used to perform this sex act, you recall him stating yes?
A. Yes, sir, I do.
 Q. Do you recall after he was asked to describe the container that the lubricant was in, that he stated that it was in a tube?
A. Yes, sir, I recall.
 Q. And do you recall him also stating or making motions with his hands as if squeezing the tube?
A. Yes, sir.
After Sergeant Williams testified, Officer Boone was called to the stand, and excerpts from his testimony appear below:
 Q. Let me ask you this: Talking about knowledge of what happened, were you present when Peter Boy — when you discussed the case with Peter Boy?
A. Yes.
Q. Were you present on the 21st day of April?
A. Yes.
Q. Who is Peter Boy? Tell us what his name is.
A. Horace Salter.
 Q. Now, Sergeant Boone, where does he live, where did he live at that time?
A. He lived down on Ann Street.
 Q. South Ann Street, didn't he? Sergeant, how close is that to Ladd Stadium?
 A. It's probably five or six blocks, maybe a little further block-wise from the —
Q. Pretty close to Ladd Stadium; isn't it?
A. It's pretty close.
 Q. Let me ask you this: Do you think it would be in the paper what kind of bullet was used to kill Mr. Smith with?
A. No, sir.
 Q. You think it would be in the paper perhaps where the car was left or found the next day?
A. Yes, sir, it was —
 Q. All right. But, would it be in the paper what kind of bullet was used to kill Mr. Smith? It wouldn't, would it?
A. No, sir.
. . . .
 MR. ORSO: Judge, this is the statement on the 19th of April and I'm talking about an interview on the 21st of April. An interview in which Mr. Salter admits that he killed, shot, stabbed and killed this man that we're talking about, 21st of April.
 Q. You were present at that interview, weren't you?
 A. I was present in an interview, that ain't what he said.
 Q. Are you telling me now that he did not tell you that he shot this man? He shot this sissy and told you where the sissy lived.
A. Not the man we're talking about in this case.
 Q. Oh, now you're saying this is a different person.
A. He never did say who it was.
Q. He didn't name Smith, did he?
A. No, sir.
 Q. Otherwise it follows right down the line what happened in this case, doesn't it?
A. Pretty close.
 Q. Pretty close. Pretty close. Two days after the statement, he denied anything about knowing anything about it, right?
A. That's correct.
 Q. And it just so happened that you didn't sit this man down and tape this, did you, and make him sign a statement, did you?
A. No, sir.
 Q. All you got is an interview and who was there with you when you were talking to Salter?
A. Sergeant Mayo.
Q. Who else was? *Page 790 
A. I don't recall who else was there that day.
 Q. Detective Williams who testified earlier about this?
 A. Yes, sir. More than likely he was there, he's generally with me on every interview.
 Q. Did Johnny say anything about a tube of lubricant? Did he tell you anything about that on this tape here?
A. Johnny Brown?
 Q. Yes, is there anything on there about a lubricant?
A. I don't recall it.
 Q. How about this interview with Salter? Did he talk about a tube of lubricant that was used?
 MR. GALANOS: We simply ask that the witness be shown the piece of paper that he's flashing.
MR. ORSO: Gladly.
(Pause.)
 Q. Salter was asked if he engaged in any sex act. Do you recall him saying that he did?
A. Let me see what's on this paper here. Yes.
 Q. Do you recall him being asked if any kind of lubricant or grease was used? What did he say?
A. Yes.
 Q. Okay. Was he asked to describe that? Do you recall that?
A. Yes.
 Q. What did he say? Would you read us what he stated?
A. Yes, he said it was in a tube.
 Q. Said it was in a tube. And what did he do with his hands?
 A. He made motions to indicate how the lubricant was ejected from the tube.
 Q. All right, sir. That's pretty detailed, isn't it?
A. Yes.
 Q. You also recall him telling you where he got the knife.
A. Yes.
Q. Where did he say he got the knife from?
A. Out of the kitchen.
Q. That's pretty detailed too; isn't it?
A. Yes, sir.
Q. That wasn't in the newspaper, I bet, was it?
A. No, sir.
 Q. And he also gave you directions to get to the sissy's house, didn't he?
A. Yes, sir.
 Q. When asked how to get there, did he not state, you go down the Avenue and turn by the old theatre and the sissy's house is on the left. Didn't he state that to you?
A. Yes, sir.
 Q. Did you hear Mr. Smith testify yesterday and I asked him would that be proper directions to get to Hilliard Smith's house?
A. Yes, sir.
Based upon the foregoing, there was evidence that Horace Salter relayed certain facts to the police officers that were not common knowledge and that fit the fact pattern of the Smith murder. For example, Salter told the police that he shot and stabbed "a sissy"; that the knife he used he got from a drawer in the kitchen and the gun which he used fired bullets which were smaller than .38 caliber bullets. He gave the police directions to the victim's house, and told the police that he used a lubricant before he killed the "sissy," and a tube of lubricant was found in the victim's bedroom. Furthermore, he said that he took a typewriter from the victim's house, and he lived only a few blocks from where the victim's car was found. Thus, Salter admitted to police that he was involved in an assault with a knife and a gun, and the circumstances surrounding the assault he described were very similar to the circumstances surrounding the Smith homicide.
The State argues that there was enough evidence produced to link the defendant to the crime. Other than what we have already mentioned, the State introduced a statement of Johnny Brown, the defendant's brother, in which he told the police that the defendant admitted having shot and stabbed the victim. At trial, however, *Page 791 
Johnny Brown denied that the defendant told him anything about the crime, and stated that he was coerced into making the statement through threats of the interrogating officers, and that they had told him the facts which he used in his statement.
Concerning the out-of-court statement of Johnny Brown, first, the law in Alabama is clear that this statement may not be used as substantive evidence against the defendant. According to C. Gamble, McElroy's Alabama Evidence, 159.02(1) (3d ed. 1977):
 A self-contradictory statement by a witness who is not a party, whether testified to by him on cross-examination or proven by others, is not substantive evidence of the matter asserted. The statement operates only to impeach or discredit the witness and has no other effect; in particular, such statement cannot be the basis of a finding of fact necessary to the establishment of liability or defense.
See also Randolph v. State, 331 So.2d 766
(Ala.Crim.App. 1976). Thus, Johnny Brown's statement to police could have been used only to discredit his testimony at trial. Second, even if the statement could have been used against the defendant, the facts concerning the murder conveyed in the statement of Johnny Brown fall woefully short of the detail which was given by Salter. Furthermore, most or all of the facts contained in Johnny Brown's statement appeared in the newspaper and were thus common knowledge in the community and, therefore, were not highly probative of anything.
The State also argues that Salter gave a second statement to police in which he never admitted to harming anyone. Even so, it does not detract from the fact that the event described by Salter originally was almost identical to the circumstances of the Smith homicide.[1] In the instant case, we are of the opinion that the State did not meet its burden of excluding every reasonable hypothesis other than that of the guilt of the accused. Therefore, the judgment of the Court of Criminal Appeals is reversed, and the cause is remanded to that court for it to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
TORBERT, C.J., and JONES, ALMON, SHORES, BEATTY, HOUSTON and STEAGALL, JJ., concur.
MADDOX, J., not sitting.
[1] We do not have before us any question as to why the defendant, rather than Horace Salter, was chosen as the focal point of this investigation.