The petitioner, Inga Mauricio, was indicted March 29, 1985, in Cullman County for the alleged stabbing of her newborn infant. She was tried before a jury, which found her guilty of attempted murder. The circuit court sentenced her to 15 years' imprisonment, ordered her to pay $10,000 to the victim's compensation fund, and denied her application for probation. The Court of Criminal Appeals, 497 So.2d 858, affirmed the judgment without opinion and this appeal followed. This Court granted certiorari based on petitioner's Rule 39(k) A.R.A.P. statement of facts.
In March of 1985, Inga Mauricio was a 20-year-old student at Wallace State Community College. At the time she was 7 1/2 months pregnant, a fact she had concealed from her parents. On Saturday, March 23, Inga was at home, with her parents, preparing her Sunday school lesson for the next day. She had been teaching first and second grade Sunday school for over a year at the time. She went to bed that night about 11:00 p.m. At about 12:30 on the morning of March 24, she woke her mother, complaining of stomach cramps and a headache. She took a couple of aspirin and went back to bed. At 1:30 she woke her mother again, complaining of nausea. At 2:30 she again woke her mother, who assisted her through her nausea. At 4:30 she awoke again; this time her water had broken. She went into labor and after some effort she could feel the crown of the baby's head emerge. Her mother and father's bedroom was at the other end of the house and, for whatever reason, Inga did not summon their assistance. *Page 88 
She continued to deliver her child and after what she testified to be a considerable amount of time and painful effort, the baby's entire head arrived. It was at this point that she encountered serious difficulty. She testified that she was in severe pain at this time and that she was bleeding profusely. According to her testimony she could not summon enough strength to force the child's shoulders out. She explained that she was sitting up in the bed on top of a pillow during the delivery and that after the head emerged the baby just stopped. The baby's head was face down on the bed and it would not move any further even after her persistent effort. Inga testified that at this point she reached down and grasped the child's head under the chin with both hands and pulled with all the force she had. Initially, the pulling was to no avail. She attempted to pull on the baby's chin and push with her abdominal muscles at the same time, but could not coordinate the two. She returned to pulling on the baby's chin and finally delivered its shoulders. She then guided the baby out, with the umbilical cord and placenta following shortly thereafter.
Inga testified to reaching over to the night stand, at this point, for a small pair of scissors. She opened up the blades, wiped them off with her bare hands, and then attempted to cut the umbilical cord. Unable to cut it with the small scissors, she took a larger pair of scissors, opened the blades, and wiped them off with her hands once again. She again attempted to cut the umbilical cord, this time with some success. Although she did not completely sever the cord from the baby, it was substantially separated.
She spread a sleeping bag over her bed, to cover the water and blood. She then wrapped her baby in a terry cloth robe, and put it on the dry part of the floor next to the bed. Inga testified that she knew her baby was alive at this point because it was breathing. She recalled, on the stand, seeing scratches on the baby's neck when she wrapped it in the robe. Inga rested on the sleeping bag for a while and then went to wash up in the bathroom. She did not recall any other events that morning until she was awakened in the hospital by Dr. Ensor.
Mrs. Mauricio found Inga hemorrhaging in the bathroom early on the morning of the 24th. She described Inga as pale and weak at that time. Inga was unresponsive and did not talk to her parents after they found her. Mrs. Mauricio described the bathroom as being very bloody. Her daughter had blood on her and there was blood in the hall leading to her room. She found blood on her daughter's bed and on the floor in her room. Although Mrs. Mauricio was unaware that Inga had been pregnant, she took her to Cullman Medical Center for immediate medical treatment.
Loretta Nix, the duty nurse at Cullman Medical Center on March 24, was present when Mrs. Mauricio admitted Inga to the emergency room about 6:00 a.m. Inga complained of cramping and vaginal bleeding to Nix and Dr. LaPointe, the examining physician. Dr. LaPointe conducted a pelvic exam on Inga and diagnosed her as having had a miscarriage and having lost excessive blood. Dr. LaPointe then called in Dr. Ensor, an obstetrician-gynecologist.
Dr. Ensor found that Inga was bleeding "quite profusely" when he first examined her. His opinion was that she had delivered a 4- to 5-pound baby in the past few hours, losing a lot of blood in the process. At the time of the examination, Inga did not mention to him that she had delivered a child. He described her medical condition as "not stable" at the time. He administered I.V. fluids to her to stabilize her prior to the administration of anesthesia which, was necessary in order to perform a dilation and curettage.
Around 1:00 p.m., several hours after the operation, Dr. Ensor asked Inga if she had delivered a child. He testified that her answer was that she had found the child in bed and that she thought it was dead. He also testified that she told him at the time that she had placed it under the bed. He asked her if she knew about any injury to the child and she said she did not. Dr. Ensor's opinion was that he did not see any evidence that Inga would have any physiological *Page 89 
difficulty in delivering a 4 1/2-pound baby in ordinary circumstances. In his opinion, Inga could have bled to death had the D. and C. not been performed; such bleeding was, he said, an unusual condition even among mothers who self-deliver. He also said that a self-delivery such as Inga performed would be sufficiently traumatic to induce shock. He testified that it is normal for a mother to want to curl forward and sit up, as Inga did. He said that in some births, where the infant's shoulders are too wide, the attending doctor has to turn the child with forceps in order for it to clear the pubic bone. He also said that an excessive loss of blood by the mother, as Inga had during the birth, could delay delivery of the child.
He described a normal umbilical cord as varying in diameter from the size of a dime to the size of a quarter. There are three blood vessels encased in a gelatinous material known as "Wharton's jelly." There is a thin and rather tough membrane covering the outside of the cord, which holds it all together. His testimony, as an obstetrician-gynocologist who had delivered over 6,000 babies, was that there is a thin layer of fatty tissue surrounding the blood vessels in the umbilical cord. He explained that it is difficult to cut an umbilical cord, even when using surgical scissors.
After Inga and her mother left for the hospital, Mr. Mauricio began cleaning up the bedroom. He heard a child cry and, according to his testimony, found the baby on the floor next to the bed. Mr. Mauricio called his wife at Cullman Medical Center and told her about the baby. She was in the emergency room with Inga when her husband called. Her testimony was that she did not know, until her husband's call, that Inga had been pregnant. She went back home and picked up her husband and the baby. She held the baby, which was still wrapped in the robe, while he drove to Parkway Medical Center in Decatur. When they arrived neither of them had examined the child, knew it had any injury, or even what sex it was. Mrs. Mauricio laid the child on the examining table and was sent out of the examining room.
Dr. Putnam was the doctor on duty in the emergency room at Parkway Medical Center at 9:15 when baby Mauricio was admitted. His examination of the baby revealed that it was a viable infant with a placenta partially attached. He cleaned the blood from the baby's mouth and throat, which was causing it difficulty in breathing. He then cut the umbilical cord and tied it off. On further examination of the child, Dr. Putnam noticed cuts in its neck. He assumed, because the baby's neck was lacerated and the child had some blood in its throat, that the cuts extended from the front of the neck, through the trachea, to the back of the neck. He estimated to the jury that each cut was an inch to an inch and one-half deep. He also found some "scratch-type wounds" on the child's neck. After the child had been at Parkway 30 minutes, Dr. Putnam transferred it to Decatur General Hospital.
He testified that his examination of the baby was only preliminary and that his diagnosis was inclusive. Although the nurse's record showed that the umbilical cord was cut in a jagged manner, Dr. Putnam thought it was a single cut almost totally transecting the cord. Although somewhat confused about the distinction between "parallel" and "perpendicular," he testified that the cuts in the child's neck were short, and in a line parallel to the baby's chin. He also detected "scratch marks" on the baby's chin. He admitted that Parkway did not customarily treat infants and that babies are not delivered there.
Dr. Rogers was the pediatrician on duty at Decatur General when baby Mauricio was brought in. His examination of the baby was more thorough than that of Dr. Putnam, lasting over 1 1/2 hours. His diagnosis was that this was a premature baby, suffering from hypothermia, with multiple neck wounds. His visual inspection of the child did not reveal any injury to the windpipe or trachea. He regarded the baby as in stable but serious condition due to its low body temperature, underdeveloped lungs, and neck lacerations. In Dr. Rogers's opinion, the injuries were "linear" as opposed to puncture wounds. His opinion *Page 90 
was that one-half inch fingernails could have caused the wounds, even though he had not measured their depth. He also said it was possible the wounds were caused by a pair of scissors. After his examination, Dr. Rogers had the baby transferred to Children's Hospital in Birmingham.
Dr. Baldwin was the pediatric surgeon on duty at Children's Hospital when baby Mauricio was admitted. He operated on baby Mauricio for about an hour and performed two operations during that time. First he performed a bronchoscopy on the baby. This is an internal examination performed by inserting a small camera inside the child's throat. He found a small injury, or hematoma, in the child's trachea at the place where it divides to go to each lung. He described this injury as a bruise located at a point below the lacerations in the neck. He expressed the opinion that the hematoma, because of its location, was not in any way related to the neck lacerations.
After he concluded his bronchoscopy, he conducted an exploration of the neck wounds. He found that some of the muscle tissue in the baby's neck had been damaged. He repaired this and stitched up the lacerations in the child's skin. He testified that the wounds varied from 3/8 to 5/8 inch in length. There was one wound larger than this, but Dr. Baldwin supposed that it might have been several lacerations in one place. Although he did not probe to determine the depth of the wounds, he estimated almost all of them to be 1/4 to 1/2 inch deep. The exception was the site of the supposed multiple lacerations, which appeared to be about 3/4 inch deep. There was no evidence of injury to the trachea, esophagus, or blood vessels from the lacerations. In his opinion, these injuries to the neck did not affect the baby's ability to swallow.
Dr. Baldwin told police investigators the day after surgery that he did not think the wounds were made by anything very sharp. The wounds were "not clean," contra-indicating the use of a knife, razor, or piece of glass. He indicated that they were linear lacerations with a somewhat jagged appearance. He told the police, "The wounds were not the type of wounds that would have been made by a metal nail or an ice pick." (Emphasis added.) He suggested that something flat made the wounds, perhaps a fingernail file. He said if "a semi-sharp linear object impaled the skin and then a force was exerted on that object, it could produce the type of injury that we see in this child." He said the injuries could have been made by a fingernail or by either of the two pairs of scissors admitted into evidence by the State. He also expressed an opinion that the wounds, by their jagged appearance, indicated a pulling force on the instrument that caused the wound. He indicated that the wounds "were consistent with a fingernail being pushed in and then some tension exerted on it."
This comported with Dr. Ensor's testimony that it would take a lot of force to puncture an infant's neck. Dr. Ensor explained that in order to open the trachea of an infant, as he had done in the past, it "takes a sharp knife with pressure". His opinion was that long fingernails could cause the lacerations found in the baby's neck. Dr. Baldwin's opinion was also that "reasonably sharp" fingernails extending 1/4 to 1/2 inch beyond the fingertip would be sufficient to inflict the wounds. He did not think the wounds would have any lasting effect on the child. Dr. Baldwin exhibited the baby to the jury and described the wounds on the child's neck as "linear in orientation," or lacerations 1/2 inch long, accompanied with several small scratch-type wounds. He estimated that there were eight or nine wounds in all.
The State developed Inga's testimony, during cross-examination, that her fingernails were as long as 1/2 inch when she delivered the baby. Dr. Ensor, the physician who performed the D. and C. on Inga, also said it was possible that her nails were as long as 1/2 inch and certainly as long as 1/4 inch.
The State called Freddie Day, a Cullman police officer who investigated the incident. He began his investigation at 11:30 on the morning the child was born. He interrogated Inga's mother at Decatur General Hospital *Page 91 
and talked to Dr. Rogers, who was attending the child at the time. He left Decatur General and went to Cullman Medical Center, where Inga was recovering. He and Detective Wood obtained a search warrant of the Mauricio home in Cullman, and they began their search about 3:30 that afternoon. The search revealed two pairs of scissors, which appeared to have blood on them: one pair with short blades, approximately one inch long, and the other with blades about three inches long. The detectives sent these scissors to the state toxicology lab in Huntsville. Day testified that the scissors were in substantially the same condition when he sent them to Huntsville as when he found them in Inga's room. The search also revealed a couple of sheets, two towels, a sanitary napkin, one gown, one pair of panties, a wash cloth, and a pillow, all of which had blood on them. Detective Wood indicated on the stand that there was blood "all over the carpet, and the floor, on the mattress." The officers concluded their search just past 4:00 that afternoon.
The State called Roger Morrison, a forensic scientist with the Alabama Department of Forensic Science in Huntsville. Mr. Morrison is a specialist in forensic serology, the examination and identification of biological fluids and tissues. He conducted tests on both pairs of scissors and compared the findings with blood samples from Inga and the child. Both pairs of scissors had type A blood on them, the same type as the child. Morrison testified that the scissors had dried blood along the entire length of the blades and on the handles of both pairs. He also found fatty tissue in "small clumps" at various locations along the length of the blades, about three inches on the large scissors; he described it as "Basically a fine layer of the fatty tissue along the entire length of the blade." Morrison was unfamiliar, however, with "Wharton's jelly," a tissue which is found in the umbilical cord and which is the same color and consistency as fatty tissue. His testimony was that he took a 1/8-square-inch sample of blood from each pair of scissors in order to identify the blood on the scissors as the baby's. Two other blood tests performed on the samples taken from the scissors were inconclusive regarding whether the blood was Inga's or the child's. He admitted that he did not test all of the blood on the scissors in order to see if some of it belonged to Inga.
The State also called Dr. Joseph Embry, a forensic pathologist who had performed hundreds of examinations on umbilical cords, to rebut the testimony of its earlier witness, Dr. Ensor. Dr. Embry testified that there is no fatty tissue in an umbilical cord and that, hypothetically speaking, fatty tissue would not be found on scissors that had cut an umbilical cord.
All of this testimony was presented to the jury, which deliberated for 10 hours. The jury found Inga Mauricio guilty of an attempt to commit murder by stabbing her child with a pair of scissors. As stated earlier, she was sentenced to 15 years without probation, and was ordered to pay $10,000 to the victim's compensation fund.
The issue presented for review is whether the Court of Criminal Appeals erred in affirming the trial court's ruling that the circumstantial evidence relied on by the State, and which under the facts was necessary for a conviction, was sufficient, as a matter of law, for the jury to conclude beyond a reasonable doubt that Inga Mauricio was guilty of attempted murder. The Court of Criminal Appeals set out the test for reviewing sufficiency of the evidence in Cumbo v.State, 368 So.2d 871, 874-75 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979):
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonable find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961). *Page 92 
" '. . . .
 " 'Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilt beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. . . .' " (Quoting Odom v. United States, 377 F.2d 853, 855 (5th Cir. 1967).)
Cumbo cites Williamson v. United States,365 F.2d 12, 14 (5th Cir. 1966), for the following proposition:
 "[T]he standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude."
What this Court said in Ex parte Acree, 63 Ala. 234
(1879), is likewise relevant:
 "The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires."
This was elaborated on in Fuquay v. State,22 Ala. App. 243, 246, 114 So. 892, 894, rev'd on other grounds217 Ala. 4, 114 So. 898 (1927), where the Court of Appeals said:
 "The law is that such evidence (circumstantial) is always insufficient, where, assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the form of proof. . . . And . . . our own Supreme Court in the case of Miller Brent Lumber Co. v. Douglas, 167 Ala. 286, [288], 52 So. 414, [415] [1910], . . . said:
 " 'The possibility that a thing may occur is not alone, under any fair, reasonable deduction, evidence, even circumstantial, that the thing did in fact occur.'
 "The Iowa court has very clearly expressed the same idea in the following language:
 " ' "It has been found to be a wise and safe rule to require circumstantial evidence to go so close to the fact to be proved that it must be the immediate and direct inference therefrom. Any other rule would result in great uncertainty. If the ultimate fact should be drawn from intervening inferential facts, the probability of its correctness would be much weakened. It would be a probability based upon a probability. The law will not tolerate such uncertainty." It is a general rule, in determining whether the circumstances relied upon furnish any evidence whatever of the conclusion sought to be drawn therefrom, that the facts which the evidence tends to establish must be of such nature and so related to each other that the conclusion is the only one that can fairly or reasonably be so drawn. It is not sufficient that they are consistent with such conclusion, if they are equally consistent with some other conclusion.' Klumb v. Iowa State Traveling Men's Association, 141 Iowa 519, [520,] 120 N.W. 81, [82] [(1909)]." (Emphasis added.)
As Judge Benjamin Cardozo said of circumstantial evidence inPeople v. Galbo, 218 N.Y. 283, 112 N.E. 1041, 1044
(1916), these presumptive evidences "must be very warily pressed, for it is better five guilty persons should escape unpunished than one innocent person should die." Quoting Lord Hale at 2 Hale P.C. 289. In that case Judge Cardozo reversed the murder conviction of a legless cripple, who was tried before a jury which found he had savagely beaten the victim to death. The victim, *Page 93 
Francesco Manzella, was a strong man with a reputation in the community of being an extortionist by trade. He was murdered in a fierce battle, during which his head was severed. Witnesses after the fact saw Mr. Galbo driving his horse-drawn cart, with the victim's remains contained in a barrel on the cart. Galbo was arrested within 36 hours of the crime, not the least bit worse for wear and tear. Cardozo explained it would be impossible for the defendant to commit such a crime and escape without a scratch or blood stain. In Cardozo's opinion, it was apparent that Galbo was an accessory to the crime, but the evidence did not prove he was the principal.
 "Insufficient evidence is, in the eye of the law, no evidence. . . . It is a mere accident that the jury found him guilty of murder in the second degree. To sustain their verdict we must be prepared to hold that on the same evidence they might have sent him to his death. The law is not so lax in its forfeiture of life."
Galbo, 112 N.E. at 1045.
In this case the circumstantial evidence, and the reasonable inferences that can be drawn from it, are, likewise, not sufficient, in themselves, to sustain a conviction of guilt. Circumstantial evidence must not only be consistent with guilt, but must also be inconsistent with any rational hypothesis of innocence. See People v. Staples, 149 Cal. 405,86 P. 886 (1906).
Here we have a 20-year-old who gives birth to a child, without any help whatsoever, in the darkness of her bedroom just before dawn. She performed this feat without the help of a mid-wife or pain killing drugs. It is uncontested that Inga Mauricio lost a lot of blood during this ordeal. The testimony of Dr. Ensor, the physician who performed a D. and C. on Inga after she gave birth, was that she had lost "an excessive amount" of blood. He indicated that she would have died from the blood loss if medical attention had not been immediately sought for her. He testified that it was not unusual for a woman who had gone through a difficult birth and had lost excessive blood, as Inga had, to go into shock and lose the benefit of her rational faculties.
Inga testified to having great difficulties during the birth. She claimed the child's head passed through the birth canal without complication but that its shoulders would not pass. She testified that in agony and panic she reached down with both hands and pulled on the baby's head to free it. After repeated attempts at pushing and pulling on the child, it was born alive. Dr. Baldwin testified that some deliveries require the use of forceps to turn the child in the birth canal in order for the child's shoulders to clear. Inga did not have the tools to turn the child in order to facilitate delivery.
The State's case relied primarily upon the existence of two pairs of bloody scissors and the testimony of Dr. Putnam, who performed a cursory examination of the infant at Parkway Medical Center in Decatur. He is neither an obstetrician, a gynecologist, nor a pediatrician, and he admitted on the stand that he was not qualified to treat the child's injuries under the circumstances.
Dr. Putnam estimated for the jury that the child's wounds were at least an inch to an inch and one-half deep. He also surmised that the injuries had severed the trachea and major blood vessels because one of the wounds was bubbling blood. This conjecture on the part of Dr. Putnam was wholly unsupported and inappropriate in light of the informed testimony of Drs. Rogers and Baldwin regarding the condition of the child.
Dr. Rogers examined the child for over an hour and a half. Although he considered the child to be in "guarded condition", he thought its low body temperature and underdeveloped lungs, in addition to the neck injuries, were responsible for that condition. In his opinion, fingernails could have caused the injury to the child's neck.
Dr. Baldwin performed the surgery on the child, and found that there were eight or nine wounds in its neck. His opinion was that fingernails or either of the two pairs of scissors could have made the injuries. The jagged appearance of the *Page 94 
wounds, in his opinion, "were consistent with a fingernail being pushed in and then some tension exerted on it." This supported Inga's claim that she caused the injuries while attempting to self-deliver the child.
The other circumstantial evidence on which the state relied was the pairs of scissors that Inga said she had used in cutting the umbilical cord. Roger Morrison performed blood tests on both pairs of scissors. He testified that there was blood and fatty tissue along the entire length of the blades of the scissors. On cross-examination he indicated he was unfamiliar with Wharton's jelly, a tissue which is found in the umbilical cord and which is of the same color and consistency as fatty tissue. Dr. Baldwin testified that fatty tissue could be found in small amounts in the umbilical cord. Dr. Embry, a pathologist called to refute Dr. Baldwin's testimony, said that fatty tissue could not be found in an umbilical cord.
The jury was, therefore, presented with conflicting testimony regarding whether the fatty tissue could have found its way onto the scissor blades in cutting the umbilical cord. Assuming the jury believed Dr. Embry's opinion that it would not be found in the umbilical cord, there was yet another hurdle for the jury to surmount. It was also necessary for them to infer that the tissue was indeed fatty tissue and not Wharton's jelly, which has the same color and consistency. If the jury believed Morrison's testimony that it was fatty tissue and believed Dr. Embry's testimony that such tissue was not found in the umbilical cord, there remained yet another hurdle that went to the probative utility of the scissors.
The final factual detail that the jury had to justify in order to find that the scissors had been the weapon used in the alleged crime, was the physical distribution of the blood and fatty tissue. Mr. Morrison testified that the blood and fatty tissue was distributed along the entire length of the blades. This was a length of over an inch in the small scissors and almost three inches in the long scissors. The final hurdle is insurmountable under the evidence presented in this case.
The State could offer no proof regarding how a three-inch scissor blade could cause 1/4- to 3/4-inch-deep wounds that would distribute blood and fatty tissue along the entire length of the blade. The question presented is whether the jury could reasonably conclude that three-inch scissors can cause 1/4- to 3/4-inch-deep wounds that distribute fatty tissue and blood along the entire length of the blades. This Court does not think that such a conclusion is consistent with the evidence.
The nature of the circumstantial evidence in the present case is that the jury is forced to speculate as to how the child was injured. A finding of guilt from circumstantial evidence is based on the "inference of a fact in issue which follows as a natural consequence according to reason and common experience from known collateral facts." Dolvin v. State,391 So.2d 133, 137 (Ala. 1980), citing Lowe v. State,90 Fla. 255, 105 So. 829 (1925). This is to be distinguished from a supposition, which is "a conjecture based on the possibility or probability that a thing could have or may have occurred without proof that it did occur." Ex parte Williams,468 So.2d 99, 101 (Ala. 1985), citing L. N. R.R. Co. v.Mann's Adm'r, 227 Ky. 399, 13 S.W.2d 257 (1929). "Mere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence."Williams, 468 So.2d at 101.
Although the jury may consider the circumstantial evidence and draw permissible inferences therefrom, a finding that the child was stabbed by scissors does not follow as a "natural consequence according to reason and common experience," from the evidence presented. Nor does a finding that Inga, after delivering her baby, took a three-inch pair of scissors and stabbed the baby in the neck, flow naturally from the evidence. It is difficult to reason how a mother, still recovering from birth and suffering from an excessive blood loss, can stab an infant eight or nine times with such precision that all wounds are roughly parallel to each other and each 1/4 to 3/4 inch deep. In fact, common experience and the testimony of the experts at trial suggest that making one such wound with a three-inch *Page 95 
pair of scissors would be difficult. The probability of making eight or nine such wounds is nearly incalculable. "The possibility that a thing may occur is not alone evidence, even circumstantially, that the thing did occur." Williams,468 So.2d at 102, citing Parker v. State, 280 Ala. 685, 198 So.2d 261 (1967). Mere probabilities are insufficient to rebut the presumption of innocence. Miller Brent LumberCo. v. Douglas, 167 Ala. 286, 52 So. 414 (1910).
Inga Mauricio's explanation of the events that morning, whether or not accepted by the jury as believable, are a reasonable explanation of what occurred. The State could offer no testimony or other evidence to refute her story, save the scissors and the wounds themselves. The evidence of the depth and distribution of the wounds wholly coincides with Inga's explanation of how they occurred. Every doctor who expressed an opinion — Dr. Rogers, Dr. Ensor, and Dr. Baldwin — testified that the wounds could have been caused by fingernails the length of Inga's. The location of each wound, parallel to the child's chin, also comports with Inga's version of how they were caused. The testimony regarding blood and fatty tissue on the scissor blades, assuming that the tissue was fatty tissue and not Wharton's jelly, is also confirmed by Inga's testimony. She said she wiped the blades of each pair with her hands before she tried to cut the cord. If she punctured the child's neck with her fingernails, as she claimed, it is reasonable to conclude that some of the blood and fatty tissue from the baby's neck would be on her fingers and fingernails. When she wiped the blades with her hands she presumably would have smeared them with the blood and fatty tissue. This is a reasonable explanation for the distribution of blood and fatty tissue along the length of the three-inch scissors, a fact which the State could not explain. The law of circumstantial evidence does not permit a conviction when the inferences to be drawn from the evidence point as strongly toward innocence as toward guilt. Ex parte Williams, 468 So.2d 99 (Ala. 1985), Dolvin v. State, 391 So.2d 133 (Ala. 1980),Jones v. State, 481 So.2d 1183 (Ala.Crim.App. 1985),Weathers v. State, 439 So.2d 1311 (Ala.Crim.App. 1983), Stewart v. State, 405 So.2d 402
(Ala.Crim.App. 1981).
"The law is deeply solicitous that the guilty, and the guilty alone, shall be punished for crime; hence if circumstantial evidence fairly permits an inference consistent with innocence, it will not support a conviction." Tanner v. State,291 Ala. 70, 71, 277 So.2d 885, 886 (1973). In the present case the circumstantial evidence presented to the jury raised a strong inference of innocence. In such a situation the issue becomes a question of law for the court. See People v.Galbo, 218 N.Y. 283, 112 N.E. 1041 (1916), People v.Staples, 149 Cal. 405, 86 P. 886 (1906). The defendant is ushered into court with a presumption of innocence and it is incumbent upon the State to rebut that presumption. In the present case, the circumstantial evidence offered by the prosecution did not refute Inga's theory of innocence, but rather bolstered her claim. This being the case, it was error for the Court of Criminal Appeals to affirm the conviction, because the trial court improperly denied Inga Mauricio's motion for acquittal at the close of the evidence. The judgment is reversed and a judgment of acquittal is rendered.
REVERSED AND RENDERED.
All of the Justices concur except STEAGALL, J., not sitting.