This is a tragic case because it involves the inexcusable death of 15-year-old Jason Platt. While he was deer hunting, Jason was shot in the head, neck, and chest with buckshot fired from a shotgun.
Arthur Charles Clark was charged with the shooting, was later convicted of manslaughter, and was sentenced to 20 years' imprisonment. The Court of Criminal Appeals affirmed Clark's conviction without written opinion, Clark v. State,579 So.2d 707 (Ala.Crim.App. 1991), and this Court granted his petition for writ of certiorari to determine whether the State had presented sufficient evidence to support the conviction.
On Saturday, January 20, 1990, Clark was at the "Triple 000 Hunting Club" in Clarke County. The club had a total of 32 members. At least 12 other club members were present that weekend, as was Jason Platt, whose father was a club member. The hunting club's land consisted of approximately 3,000 acres divided into about 70 hunting areas or parcels. A map showing the layout of the individually numbered areas was maintained at the hunting club's camp. Hunting club rules required all *Page 24 
hunters to post notice of the area on which they would be hunting. The hunters posted these notices near the map. The purpose of this procedure was to promote safety by giving the hunters notice of where other hunters were hunting.
For Saturday's early hunt, Clark had posted notice that he would be hunting in area number 28, which was located near the midpoint of an unpaved road known as "the number one road." The number one road runs primarily north and south. Jason Platt had posted notice that he would be hunting in two areas located on the southwestern side of another unpaved road known as "the number four road." The number four road is located to the southwest of the number one road and runs northwest and southeast. Dense forest and several other hunting areas separate the two roads. The two roads do not intersect.
According to Clark's testimony, which other witnesses corroborated in its principal points, Clark awoke at approximately 5:30 a.m., ate breakfast, and left the camp at approximately 6:30 a.m. to hunt. He carried a rifle and a 12-gauge shotgun. Platt had left the camp earlier. Another hunter had driven Platt to the number one road and dropped him off at the location at which club members stored their all-terrain vehicles ("ATV"). The other hunter left Platt at the number one road with his ATV.
Clark testified that when he arrived at the entrance gate to the number one road the gate was open. This led Clark to believe that another hunter was in the area. Because of the possibility of another hunter's being in the area, Clark said that he decided not to hunt there. Instead, he drove to the number four road. When he arrived, he got out of his truck and fired two shots at a turkey, using his 12-gauge shotgun. This occurred at approximately 7:00 a.m.; another hunter testified that he heard two shots at 7:10 a.m. Clark then swapped his shotgun for his rifle and hunted in the area for about an hour.
Around 8:00 a.m. Clark left the area. On his way back to the camp, Clark met another hunter, Raymond Roe. Roe had found a dead deer and needed Clark's help to retrieve the deer. Clark and Roe carried the deer back to the camp and began dressing it. At this time, Clark began to drink beer.
Later that morning, after most of the other hunters had returned to the camp, the hunter who had taken Platt to his ATV became concerned when Platt did not return. He began to search for Platt and, with another hunter's assistance, eventually found Platt's body lying across his ATV in a clearing on the east side of the number one road. He had been struck by pellets of 00 buckshot in the head, neck, and chest, and was dead when he was found. Platt was not wearing a hat, vest, jacket, or any other garment that was "hunter orange." The clearing where Platt's body was found was not near the number four road, where he had indicated he was going to hunt. Instead, it was on the east side of the number one road and north of area 28, which Clark had given notice of hunting on, a considerable distance from the area for which Platt had given notice. The exact distance between area 28 and the number four road is not clear from the record, but one witness estimated it to be between one-half and three-fourths of a mile.
After they learned of Platt's death, all of the club members at the camp became upset. Officers from the Clarke County Sheriff's Department arrived shortly thereafter and began their investigation of Platt's death. They asked the hunters to surrender their shotguns. At least five shotguns were given to the officers, but there is no evidence that the investigating officers conducted a systematic search of the camp and vehicles for any other shotguns. Instead, from the testimony of club member Fred Blankenberg and deputy Jack Day, it appears that the officers relied on the club members to turn over their shotguns voluntarily.
The investigating officers also asked the hunters to turn over their unfired shells. Clark turned over a number of Federal and Winchester shells. The record is not clear who was present or how many shotgun shells the investigating officers received from hunters other than Clark. When *Page 25 
Clark gave the officers his shells, he informed the officers that he had fired two shots at a turkey earlier that morning along the number four road. Two expended Winchester shells were later found along the number four road in the area where Clark said he had fired those shots. On investigation of the scene, officers found an expended Federal shotgun shell ("the Federal shell") on the ground alongside the number one road, approximately 90-100 feet from where Platt's body was discovered. The State's theory is that buckshot from the Federal shell killed Platt.
The State's case against Clark was necessarily based on circumstantial evidence, and the main evidence that the State contends links Clark to Platt's death is the Federal shell. Other circumstantial evidence also seemed to suggest the possibility that Clark had an opportunity to commit the crime. However, a conviction based solely on circumstantial evidence can be sustained only if the jury could have reasonably found that the State's evidence excluded every reasonable hypothesis except that of the defendant's guilt. Ex parte Mauricio,523 So.2d 87, 91 (Ala. 1987); Cumbo v. State, 368 So.2d 871, 874-75
(Ala.Crim.App. 1978) cert. denied, 368 So.2d 877 (Ala. 1979). A possibility, even a probability, that the crime occurred in the way the State alleges is not enough to support a conviction, because "[m]ere possibility, suspicion, or guesswork, no matter how strong, will not overturn the presumption of innocence." Ex parte Williams, 468 So.2d 99, 101
(Ala. 1985). If the circumstantial evidence can be reconciled with a theory that someone other than the accused might have done the criminal act, the defendant's conviction must be reversed. Ex parte Brown, 499 So.2d 787 (Ala. 1986).
According to Richard Carter, the State's firearms and toolmark expert, markings on the Federal shell indicated that it had "been subjected to the mechanical action" of Clark's shotgun, i.e., that the Federal shell had, at some time, been loaded into and unloaded from Clark's shotgun. These "loading marks" would result regardless of whether the shell had been fired from Clark's shotgun. However, the State's expert also testified that the firing pin and breech impressions on the Federal shell were not sufficiently distinct to allow him to state that Clark's shotgun had fired the Federal shell. In contrast, the expended Winchester shells retrieved from the number four road did have distinct firing pin impressions and were thereby identified as having been fired from Clark's shotgun. Regarding the Federal shell, Mr. Carter testified:
 "Q. With regards to your examination of this shell, what, if anything, did you do?
 "A. I again compared it with the shotgun shells that I had test-fired. I could not determine if this shotgun shell, this particular shotgun shell, had or had not been fired in this particular shotgun, but there were markings on this shotgun shell which in my opinion were made by this shotgun. In other words, this shotgun shell has been subjected to the mechanical action of that particular shotgun."
Also see Exhibit A to this opinion, which is Mr. Carter's report that was introduced into evidence.
Larry Fletcher, another firearms and toolmark expert, testified on behalf of Clark. He also test-fired Clark's shotgun and obtained several expended shells from this test-firing. By examining the firing pin impressions on these several shells, he was able to identify Clark's shotgun as having fired the test shells. He also testified that, based on his examination of firing pin impressions, it was his opinion that Clark's shotgun had fired the two Winchester shells found along the number four road.
During trial, Clark's expert and the State's expert obtained the trial court's permission to conduct further tests on Clark's shotgun. The experts took Clark's shotgun to the State crime laboratory in Mobile, where they fired an additional 40 shells from Clark's shotgun. Again, by examining the firing pin impressions, both the State's expert and Clark's expert were *Page 26 
able to identify Clark's shotgun as having fired each of those 40 shells. Finally, Clark's expert testified that, based on his examination of the firing pin impressions on the Federal shell and on all of the other shells, it was his opinion that Clark's shotgun had not fired the Federal shell. A portion of his testimony is as follows:
 "Q. Look at State's Exhibit Number 11, and I'll ask you if you can identify that, please, sir.
 "A. This is a 12-gauge spent shotshell of Federal manufacture. I can identify it by the initial . . . or, at least, my initials are on this particular shotshell.
 "Q. All right. When did you put your initials on the shotshell? Do you recall?
"A. April the 11th of 1990.
 "Q. Was that represented to you as being the shell that was found at the scene of this homicide?
"A. Yes, sir.
 "Q. All right. What test did you perform on the shotgun to determine what firing marks that that shotgun leaves?
 "A. I test-fired the particular shotgun to obtain some test shotshells, to determine if these particular marks, such as the firing pin impression, the breech face, the extractor, left any marks on the shotshells, and to determine and compare to State's Exhibit Number 11.
 "Q. Okay. Now, let me show you what's been marked as State's Exhibit Number 17, I believe it is, and ask you if you can identify that, please, sir.
 "A. These are two 12-guage spent shot-shells of Winchester manufacture. They both have my initials and were also dated April the 11th of 1990.
 "Q. Okay. Now, you've told us that you test-fired the shotgun, and what was the purpose of test-firing the shotgun?
 "A. To determine if the gun, first of all, is mechanically functional — if it works correctly — and then also to obtain test shotshells so that I could compare those to other exhibits.
 "Q. Okay. So, when you test-fire one, you know that shotgun shell came out of that shotgun.
"A. That is correct.
 "Q. You watch the action so you know for a fact that that shell comes out.
"A. Yes, sir.
 "Q. All right. Then, do you compare that shell with these shells, what's been marked as [State's Exhibits] 11 and 17?
"A. Yes, sir.
 "Q. Okay. Tell the ladies and gentlemen of the jury, if you would, please, sir, what [were] the results of your comparison?
 "A. The test shotshells that I fired from the shotgun exhibited the same markings as those found on State's Exhibit Number 17, the firing pin impressions, so my conclusions were, finding those type of marks, that they were fired from that particular firearm.
 "Q. Okay. Did you examine what's been marked as State's Exhibit [Number] 11 for firing pin marks?
"A. Yes, sir.
 "Q. Okay. Did you find any firing pin marks on State's Exhibit 11?
 "A. State's Exhibit Number 11 exhibited a different type of firing pin impression. They did not have the same characteristic markings as State's Exhibit Number 17 — of the two shotshells in State's Exhibit Number 17, or the test round that I had fired previously.
 "Q. All right. As a result of your testing comparison, did you form an opinion as a result of the comparison of these shotgun shells?
"A. Yes, sir.
"Q. What was your opinion, sir?
 "A. Based upon the absence of the firing pin characteristics, some other loading and chambering marks that were absent from State's Exhibit Number 11, I concluded that it was not fired from that particular shotgun.
"Q. This was back on April the what?
"A. The 11th.
"Q. April 11th.
"A. Yes, sir.
 "Q. Now, yesterday, did you have an opportunity to again fire the shotgun?
"A. Yes, sir. *Page 27 
 "Q. How many times did you fire this shotgun yesterday?
"A. The shotgun was fired a total of forty times.
 "Q. Were comparison tests made with regard to the forty rounds that was fired yesterday?
"A. Yes, sir.
 "Q. And what were the results of the comparison made yesterday?
 "A. All forty rounds were matched to the test rounds fired from the shotgun, which also matched State's Exhibit Number 17.
 "Q. So, every time that shotgun was fired in a manner in which you knew that it had been fired by this shotgun, it left this imprint of the firing pin.
"A. Yes, sir.
"Q. And it's like a fingerprint.
"A. Of this particular shotgun, yes.
 "Q. All right. After firing your test round and forming your opinion and firing the other forty rounds, do you have an opinion as to whether or not State's Exhibit Number 11 was fired in that shotgun?
 "A. None of the testing yesterday changed my opinion. I still think that State's Exhibit 11 was not fired from this particular shotgun, due to the fact that the firing pin was evident on all forty rounds, plus the other test rounds that I had fired on April the 11th."
Following the testimony of Clark's expert, a third firearms expert, Lonnie Ray Hardin, testified. Hardin is the firearms and toolmark coordinator for the State Department of Forensic Sciences. He also testified that, based on an examination of firing pin impressions, he could identify Clark's shotgun as having fired the two expended Winchester shells found along the number four road and the 40 test shells. Hardin also agreed with the other experts' conclusions that the firing pin impressions could not identify Clark's shotgun as having fired the Federal shell. However, he stated that, in his opinion, he could not exclude Clark's shotgun as the shotgun that fired that shell.
Clark responds that the State's evidence is insufficient to prove that he shot Platt. With regard to the Federal shell, Clark contends that the markings on it established only that it had been loaded into and unloaded from Clark's shotgun at some unestablished time. Further, according to Clark and other witnesses, hunting club members frequently unloaded any unfired shells from the shotguns at the conclusion of a hunt. Clark and other witnesses testified that club members frequently lent shells to other members. Club member Raymond Roe testified to the extent to which members lent and mingled shotgun shells:
 "Q [Clark's lawyer]. Have you ever loaned anybody any shotgun shells?
"A [Raymond Roe]. Yeah.
"Q. Have you ever borrowed any shotgun shells?
"A. Yes, sir.
 "Q. Is that common practice in a hunting camp —
 "A. — If you run out of shells, you borrow them, yeah.
". . . .
 "Q. When you load your shotgun, and come back after the hunt, what do you do with the rounds after you come back?
 "[The prosecutor's objection to this question was overruled.]
 "A. Like, we get through with a hunt and we [aren't] going to hunt [any]more, going for a dinner break or something like that?
"Q. Yes, sir.
 "A. Charlie keeps a bag, you know, like that. Sometimes people gives [sic] him shells back, different shells back, sometimes they don't. Whichever one they grab out of their pocket, you know, after the hunt's over. That's what they give you back, if . . . they give them back to you at all."
In summary, Clark argues that the State's evidence shows only that the Federal shell had been loaded into and unloaded from his gun at some unestablished time. More importantly, none of the State's evidence indicates that Clark's shotgun actually fired the fatal shot. *Page 28 
The State presented other evidence, which, it argues, when considered along with the evidence that the Federal shell had "been subjected to the mechanical action" of Clark's shotgun, provided sufficient circumstantial evidence to prove Clark's guilt of manslaughter beyond a reasonable doubt. That circumstantial evidence, the State argues, includes the following facts: Clark was the only hunter who had given notice that he was going to hunt along the number one road, where Platt's body was found; Clark was the only hunter who turned in Federal 00 buckshot shells; Clark had drunk beer on the morning of Platt's death; Clark became upset when told of Platt's death and asked for a beer; and finally, Clark claimed to have fired two shots at a turkey along the number four road.
Clark counters by contending that the record does not support the State's argument that he was the only hunter in possession of Federal shotgun shells loaded with buckshot. He points out that there was no proof that the investigating officers kept an inventory or list of the shells turned in by the other hunters or that they seized all of the shotguns in the camp. Instead, according to Clark, all that the evidence showed was that the investigating officers asked only those hunters who were present at the time to turn in their shotguns. He also argues that there is no evidence that he drank any beer while hunting. Clark points out that the only testimony on that issue was that he did not drink any beer until after he had returned to the camp to help Raymond Roe clean the deer.
The State's evidence, absent its expert evidence, establishes that Clark had given notice that he was going to hunt near the general area where Platt was killed on the morning of January 20, 1990; that he was in possession of a 12-gauge shotgun and some Federal shotgun shells; that he, like Platt and other hunters, strayed from the area on which he was supposed to be hunting; that he drank some beers that morning; and that he became upset when he learned of Platt's death.
This evidence does not establish that Clark shot Platt, and its probative value is diminished when considered in light of the other evidence. The other evidence indicates that the hunting club consisted of approximately 32 members. The evidence is not clear as to how many were present on January 20, 1990. However, at least 12 persons are referred to by name as having been present at some time during the day of January 20, 1990. The evidence fails to account for the arrival times or the activities of the other members who were present on January 20, 1990. Also, the evidence indicates that five other hunters were in the same general vicinity on the morning of January 20, 1990, and that some of these hunters were armed with 12-gauge shotguns. The evidence establishes that the club members borrowed shells from each other and that they often mingled shells.
The State's case, therefore, depends almost entirely on the probative value of its expert testimony. Viewing the evidence in the light most favorable to the State, as this Court must do, Ex parte Mauricio, supra, we conclude that the State's evidence was insufficient to allow the jury to conclude beyond a reasonable doubt that Clark's shotgun fired the Federal shell.
The only reasonable inference that can be drawn from the State's evidence is the one to which each firearms expert consistently testified, that is, that the Federal shell had, at some indeterminable time, been loaded into and unloaded from Clark's shotgun. That inference loses much of its apparent significance when considered in light of the uncontradicted testimony that shotgun shells that had been loaded, but not fired, were unloaded at the conclusion of a hunt, thereby acquiring "loading" marks from various shotguns, and that club members often exchanged shells.
There is no evidence that Clark's shotgun fired the Federal shell. Both of the State's firearms experts conceded that they could not identify Clark's shotgun as the one that fired that shell. Clark's firearms expert testified that, in his opinion, Clark's shotgun did not fire the Federal shell. *Page 29 
The State's evidence required the jury to speculate as to whether Clark fired the shot that killed Platt. Speculations, suppositions, and probabilities, no matter how strong, are not sufficient to overcome the presumption of innocence.Mauricio, supra; Williams, supra. Our law authorizes the State to inflict punishment for criminal acts only when the State's evidence overcomes the presumption of innocence and establishes the defendant's guilt beyond a reasonable doubt. Ex parteAcree, 63 Ala. 234 (1879). The evidence in this case was not sufficient to meet that burden, and, as a matter of law, Clark was entitled to a judgment of acquittal. Therefore, the judgment of the Court of Criminal Appeals affirming Clark's conviction is reversed, and a judgment of acquittal is rendered.
REVERSED AND JUDGMENT RENDERED.
HORNSBY, C.J., and SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
MADDOX, J., dissents. *Page 30 
EXHIBIT A
ALABAMA DEPARTMENT OF
FORENSIC SCIENCES
MOBILE DIVISION
February 1, 1990
 Re: Case No. 01(A)-90-81681 Jason Platt, Subject
MEMORANDUM: To File
BY : Richard D. Carter, Criminalist
SUBJECT : Laboratory Results
On January 21, 1990, the Clarke County Sheriff's Office requested the assistance of this Department in the investigation of the death of Jason Platt. During the investigation the following items were examined by the undersigned:
Exhibit 10. A semi-automatic "Browning" 12-Gauge shotgun, serial number 5V64319, identified as owned by Arthur Charles Clark. Examination of this shotgun reveals that it operates as designed.
Exhibit 16. An expended "Federal" brand three-inch 12-Gauge shotshell identified as found at the scene thirty to thirty-five yards from the deceased. This shotshell was originally loaded with Double-Ought Buckshot. Examination of this shotshell reveals that it has been subjected to the mechanical action of the Browning shotgun described as Exhibit 10. It could not be determined if this shotshell was or was not fired in the Browning shotgun.
Exhibit 11. Two (2) expended "Winchester" brand 12-Gauge shotshells, identified as found on "#4 road". Laboratory comparisons reveal that both of these shotshells were fired in the Browning shotgun identified as Exhibit 10 above.
Exhibit 12. Four (4) unfired 12-Gauge "Federal" shotshells, and six (6) unfired 12-Gauge "Winchester" shotshells, all identified as removed from the pick-up truck of Charles Clark. Laboratory examinations reveal that two (2) of the "Winchester" shotshells have been subjected to the mechanical action of the Browning shotgun identified as Exhibit 10 above.
 "FORENSIC SCIENCES INVOLVE THE APPLICATION OF SCIENCE AND MEDICINE TO THE PURPOSES OF JUSTICE." *Page 31 
Page 2 — Laboratory Results Case No. 01(A)-90-81681
Exhibit 18. Two (2) unfired Winchester 12-Gauge shotshells and one (1) unfired Remington-Peters 12-Gauge shotshell, all identified as removed from "pocket" of Arthur Charles Clark. Examination of the Winchester shotshells reveals that they have been subjected to the mechanical action of the Browning shotgun identified as Exhibit 10 above.
Exhibit 9. Three (3) Lead projectiles and a small Lead fragment identified as removed from the body of Jason Platt. Examination of the Lead projectiles reveals them to be Double-Ought Buckshot.
Exhibit 17. A baseball type cap, "treebark camouflage" in color, identified as found at the scene. There is a yellow "Bama Portable Buildings" logo on the front of the cap. Examination of the right side of the cap reveals the presence of a Lead projectile entry hole located 1/2 inch above the lower edge, and 2 1/2 inches from the rear of the brim. Examination of the brim of the cap reveals the presence of a Lead projectile impact defect which runs from the right side of the brim towards the left center of the brim. This grazing defect is 2 1/2 inches long, and the direction of travel of the projectile was from right to left, and slightly back to front. No gunshot residue was found.
Exhibit 25. Clothing identified as removed from the body of Jason Platt, consisting of a gray Tee shirt with an Auburn University logo, and a lightweight camouflage jacket with a hood. Examination of the upper center chest area of the Tee shirt reveals the presence of a Lead projectile entry hole. This hole is consistent in placement with a wound noted to the deceased. No gunshot residue was found. Bloodstains are present. Examination of the jacket did not reveal the presence of any projectile holes.
Exhibit 15. A semi-automatic "Remington" 12-Gauge Model 11-87 shotgun, serial number PC045685. Examination of this shotgun reveals that it operates as designed.
Exhibit 19. A semi-automatic "Remington" 12-Gauge Model 1100 shotgun, serial number M353113V. Examination of this shotgun reveals that it operates as designed.
Exhibit 20. A semi-automatic "Remington" 12-Gauge Model 11-87 shotgun, serial number PC018956. Examination of this shotgun reveals that it operates as designed.
Exhibit 22. A semi-automatic "Winchester" 12-Gauge Model 140 shotgun, serial number N933381. Examination of this shotgun reveals that it operates as designed.
Criminalist
RDC/dw *Page 32