WOODALL, Justice.
 

 Marsha Colby was convicted of capital murder for the killing of her newborn baby,
 
 see
 
 § 13A-5-40(a)(15), Ala.Code 1975. The trial court sentenced Colby to life imprisonment without the possibility of parole, and the Court of Criminal Appeals
 
 *2
 
 affirmed the trial court’s judgment, in an unpublished memorandum.
 
 Colby v. State
 
 (No. CR-06-2183, December 19, 2008), 33 So.3d 649 (Ala.Crim.App.2008) (table). Colby petitioned this Court for the writ of certiorari, which we granted to address two issues: (1) whether the Court of Criminal Appeals’ decision conflicts with
 
 General Motors Corp. v. Jernigan,
 
 883 So.2d 646 (Ala.2003); and (2) whether the Court of Criminal Appeals’ decision conflicts with
 
 Ex parte Clark,
 
 591 So.2d 23 (Ala.1991);
 
 Ex parte Bailey,
 
 590 So.2d 354 (Ala.1991); and
 
 Ex parte Mauricio,
 
 523 So.2d 87 (Ala. 1987). We hold that there is a conflict between the Court of Criminal Appeals’ decision and
 
 General Motors.
 
 We, therefore, reverse the Court of Criminal Appeals’ judgment and remand the case to that court for further proceedings.
 

 Facts and Procedural History
 

 The Court of Criminal Appeals set forth the following facts in its unpublished memorandum:
 

 “The evidence adduced at trial tended to show the following. In late January of 2004, Colby, her six children — who ranged in age from 4 years to 19 years — and Colby’s common-law husband, Glenn Brewer, were living in a pair of campers after having been displaced by Hurricane Ivan. Colby was pregnant with her seventh child, which was apparently due at the end of the month.
 

 “On January 28, 2004, Colby and her mother, Barbara Gossett, attended a hearing in Baldwin County Juvenile Court involving Colby’s oldest child. That day, while at the courthouse, Colby began leaking fluid. Gossett tried to convince her to see a doctor, but Colby refused, saying she simply wanted to return home.
 

 “In late January and early February 2004, Deborah Cook, a friend of Gos-sett’s who worked at the elementary school where Colby’s younger children were pupils, became concerned after conversations with Gossett that Colby was no longer pregnant but no one had seen the baby. Cook contacted members of the Orange Beach Police Department and told them of her concerns.
 

 “After an investigation based upon Cook’s concerns, Officer Kenneth Lewel-len and Kenya Dorch, an employee with the Alabama Department of Human Resources, went to the campers where Colby was living. No one was home when Lewellen and Dorch first arrived, but Colby arrived soon afterward. Initially Colby would not talk to them about the baby, but then she told Lewellen that she had had a miscarriage. A short while later, however, Colby said she had given the baby up for adoption. She was unable to produce paperwork to confirm either version of events.
 

 “Brewer, Colby’s husband, arrived home while Officer Lewellen was there. Officer Lewellen asked Brewer for permission to search the premises. He consented, and Lewellen began searching a gutted mobile home that was near the campers. Inside, he found what appeared to be blood in the trailer’s bathroom. At that point, Lewellen suspended his search until he obtained a warrant.
 

 “When another officer arrived at the premises with the warrant, Lewellen resumed his search. He noticed a post planted in the yard, with fresh dirt around the post. When he began to dig away the dirt with his hands, Colby, who was still standing nearby watching him, told the police that the baby was buried there.
 

 “After being advised of her rights pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436 (1966), Colby gave a written statement to police. In her statement, she said that while she was taking a bath, she ‘felt a little pressure and I delivered a stillborn baby.’ (C. 398.) Colby said that the umbilical cord was wrapped around the baby’s neck and that the baby was ‘discolored.’ (C. 398.)
 

 
 *3
 
 “Colby said that she took the baby to the back of the garden and buried it about three to four feet in the ground. She used the post to mark the grave.
 

 “When she was questioned again later, Colby repeated that the baby was stillborn. She said that after giving birth, she -wrapped the baby up and left it in the trailer while she returned to the camper and got in bed with her husband. She apparently buried the baby later.
 

 [[Image here]]
 

 “The medical investigation into the baby’s death revealed the following. When Colby told police the baby was buried by the post, the Alabama Department of Forensic Sciences (‘DFS’) was called to the scene. Once employees from DFS arrived, including forensic pathologist Dr. Kathleen Enstice, the exhumation of the baby began. DFS employees found the baby was wrapped in a towel, which in turn was wrapped in a black garbage bag, which was wrapped in a comforter. The baby’s body was lying in cold saltwater because the hole in which it was buried went into the water table. There was no visible trauma to the baby’s body.
 

 “The body was transported to the DFS office, and Dr. Enstice immediately performed an autopsy....
 

 [[Image here]]
 

 “Dr. Enstice testified that based upon her findings, she believed that Colby’s baby was a full-term baby who was born alive who had ‘every chance of living or at least living longer if medical attention was provided’ (R. 1584), and that his death was caused by drowning.
 

 “On the other hand, Colby presented testimony from forensic pathologist Dr. Werner Spitz, who testified as an expert on Colby’s behalf. Dr. Spitz testified that he could not state to a reasonable degree of medical certainty that the baby was born alive. He added that ‘there is a possibility it was born alive, but there is more likelihood that it was not born alive.’ (R. 1756.)
 

 [[Image here]]
 

 “Dr. Spitz concluded that ‘in order to drown you need to first of all be alive. Then — only then can you drown.’ (R. 1740.) He continued, ‘There is, as I see it here, maybe not quite enough manifestations, findings, to allow a determination beyond a reasonable doubt. I mean, a definitive, almost a definitive confirmation that this child actually drowned.’ (R. 1740.)”
 

 A jury ultimately returned a guilty verdict against Colby. The State withdrew its request for the death penalty, and the trial court sentenced Colby to life imprisonment without the possibility of parole.
 

 Colby appealed her conviction to the Court of Criminal Appeals, alleging, among other things, that the trial court had erred in denying her challenges for cause as to several potential jurors and that the State had failed to present sufficient evidence indicating that the baby had been born alive and that Colby had intentionally killed the baby. The Court of Criminal Appeals concluded, among other things, that the trial court had erred in denying some of Colby’s challenges for cause, but that those errors were harmless, and that the State’s evidence was sufficient to support the conviction.
 

 Colby then petitioned this Court for a writ of certiorari, raising several grounds under Rule 39, Ala. R.App. P. This Court granted the writ of certiorari to consider two of the alleged grounds: (1) whether there is a conflict between this Court’s decision in
 
 General Motors
 
 and the Court of Criminal Appeals’ holding that the trial court’s denial of some of Colby’s challenges for cause was harmless error; and (2) whether there is a conflict between this Court’s decisions in
 
 Clark, Bailey,
 
 and
 
 Mauricio
 
 and the Court of Criminal Appeals’ holding that the State had met its
 
 *4
 
 burden of proving that the baby had been born alive and that Colby had intentionally killed the baby.
 

 Analysis
 

 We first address whether Colby has demonstrated a conflict between the Court of Criminal Appeals’ decision and
 
 General Motors.
 
 Colby argued on appeal that the trial court erred in denying her challenges for cause as to several jurors, forcing her to use 9 of her 17 peremptory strikes to remove those jurors from the jury venire. In addressing this argument, the Court of Criminal Appeals stated, in pertinent part: “In the case of the two jurors, C.F. and M.B., who knew Maj. Anthony Lowery — a key witness for the State — we find that their belief in his testimony indicated a bias strong enough that it would result in probable prejudice to Colby.” That court also stated: “R.M.’s connections and business concerns were strong enough to indicate a probable prejudice in favor of the State.” The Court of Criminal Appeals went on to conclude, however:
 

 “Here, the record indicates that each of [these] challenged potential jurors [was] ultimately stricken from the jury that heard this case. Colby made no showing that her right to an impartial jury was probably injuriously affected by the trial court’s abuse of discretion in denying her challenges for cause. Therefore, we find that even with the improper rulings, Colby had a fair trial with an impartial jury.”
 
 [1]
 

 Colby argues on certiorari review that this statement by the Court of Criminal Appeals conflicts with our decision in
 
 General Motors.
 
 In
 
 General Motors,
 
 Wilbert Jernigan, individually and on his son’s behalf, sued General Motors Corporation (“GM”), among others, seeking damages under the Alabama Extended Manufacturer’s Liability Doctrine for injuries Jerni-gan’s son had sustained during an automobile accident. GM moved the trial court during jury selection to strike for cause five prospective jurors, because the jurors were “related by consanguinity within the ninth degree or by affinity within the fifth degree ... to [an] attorney in the case to be tried.” § 12-16-150(11), Ala.Code 1975. The trial court denied GM’s motions, and GM later used peremptory challenges to remove four of the challenged jurors. The fifth juror was to serve as an alternate on the jury. The jury returned a verdict in favor of Jernigan, and the trial court entered a judgment on that verdict. GM then appealed to this Court, claiming, among other things, that it was entitled to a new trial because, according to GM, the trial court had erred in “denying its challenges for cause of certain prospective jurors.”
 
 General Motors,
 
 883 So.2d at 669. We held:
 

 “Based upon the unique facts and circumstances here presented, the trial court, by denying five of GM’s challenges for cause that should have been granted, substantially impaired GM’s right to the use of its peremptory challenges in selecting a jury. In this case, unlike
 
 Bethea [v. SpringhiU Memorial Hospital,
 
 833 So.2d 1 (Ala.2002) ], the jurors who ultimately were selected fell in the category of jurors who would likely have been the subject of peremptory challenges had such challenges been available. Therefore, we conclude that the
 
 multiple errors
 
 on the part of the trial court in improperly denying GM’s challenges for cause were not
 
 *5
 
 harmless, whether or not it could have been shown that the jury ultimately seated was unbiased and impartial.”
 

 General Motors,
 
 883 So.2d at 672-73 (emphasis added).
 

 We agree with Colby that the Court of Criminal Appeals’ decision in this case conflicts with
 
 General Motors.
 
 Colby had to use at least three of her peremptory challenges to remove jurors the Court of Criminal Appeals held should have been removed for cause. Therefore, there were “multiple errors on the part of the trial court in improperly denying [her] challenges for cause.”
 
 General Motors,
 
 883 So.2d at 673. Moreover, the jury in this ease, like the jury in
 
 General Motors,
 
 included “jurors who would likely have been the subject of peremptory challenge had such challenges been available” to Colby.
 
 General Motors,
 
 883 So.2d at 673. The record indicates that the seated jury included jurors who knew witnesses for the State, jurors who expressed strong support for the death penalty, and jurors who felt that it was defense counsel’s job to prove the defendant’s innocence.
 

 The State argues that
 
 General Motors
 
 does not apply here because, it argues, the trial court did not err in denying Colby’s challenges for cause or, if it did err, this is not a case involving multiple errors. The State also argues that any error was harmless. We disagree.
 

 “ ‘ “The test to be applied [in qualifying a prospective juror] is probable prejudice. Probable prejudice for any reason disqualifies a prospective juror. Qualification of a juror is a matter within the discretion of the trial court and, on appeal, this court will look to the questions propounded and the answers given by the prospective juror to see if this discretion was properly exercised.”
 
 Alabama Power Co. v. Henderson,
 
 342 So.2d 323, 327 (Ala.1977).
 

 “
 
 ‘
 
 “To justify a challenge of a juror for cause there must be a statutory ground ..., or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.”
 
 Nettles v. State,
 
 435 So.2d 146, 149 (Ala.Crim.App.), affirmed,
 
 Ex parte Nettles,
 
 435 So.2d 151 (Ala.1983).’ ”
 

 Dailey v. State,
 
 828 So.2d 340, 342-43 (Ala. 2001) (quoting
 
 Minshew v. State,
 
 542 So.2d 307, 309 (Ala.Crim.App.1988)). In the event that probable prejudice is demonstrated, the trial court should determine whether the challenged juror can set aside that prejudice and render a verdict solely on the evidence.
 
 See Dailey,
 
 828 So.2d at 343 (“
 
 [1]
 
 “[I]f the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court,” he is not subject to challenge for cause.’ ” (quoting
 
 Minshew v. State,
 
 542 So.2d at 309, quoting in turn
 
 Mahan v. State,
 
 508 So.2d 1180, 1182 (Ala.Crim.App.1986)));
 
 see also Ex parte Ellington,
 
 580 So.2d 1367, 1369 (Ala.1991) (“In the present case, there was only a limited exchange between the attorney and [the juror]; however, that exchange does indicate probable prejudice on [the juror’s] part.... The trial judge had the opportunity to question her further to see if, despite her biases, she could listen to the facts and apply the law to them. The judge did not do so and, instead, simply denied the motion to strike [the juror] for cause.... [T]he evidence before us does indicate probable prejudice and thus an abuse of discretion on the part of the trial judge in refusing to strike for cause .... ”).
 

 After reviewing the transcript of the jury-selection process, we agree with the Court of Criminal Appeals that the trial court erred in denying Colby’s challenges for cause as to jurors C.F., M.B., and R.M. C.F. stated that Officer Anthony Lowery, one of the State’s key witnesses, and C.F. were cousins, and C.F. further stated that he “would put very much weight on” what Officer Lowery said. C.F. went on to state: “I would be somewhat prejudiced] for [Lowery].” Neither the State nor the trial court questioned C.F. to determine whether he could overcome this prejudice
 
 *6
 
 and decide the case based on the law and evidence; instead, the trial court simply denied Colby’s challenge for cause.
 

 Similarly, M.B. stated that he also knew Officer Lowery, that he would tend to give instant credibility to whatever Officer Lowery said, and that it would be difficult for him to overcome that reaction. Again, neither the State nor the trial court attempted to discover whether M.B. could overcome his apparent prejudice. Here, as in
 
 Ex parte Ellington,
 
 “[t]he trial judge had the opportunity to question [M.B.] further to see if, despite [his] biases, [he] could listen to the facts and apply the law to them. The judge did not do so and, instead, simply denied the motion to strike [M.B.] for cause.” 580 So.2d at 1369. We agree with Colby and with the Court of Criminal Appeals that this was error on the part of the trial court.
 

 R.M. stated (1) that he had heard about the case before his appearance at jury selection; (2) that he was friends with members of the Orange Beach Police Department; (3) that he sells and services vehicles for the police department; (4) that the outcome of the case, if he were to serve on the jury, could affect his business; and (5) that he would prefer not to serve on the jury because of the potential effects of his doing so on his business. The trial court asked whether, in spite of the potential effect on his business of his serving on the jury, he “would do what [he] believefd] the law and facts in this case would require [him] to do.” R.M. stated that he would. Counsel for the defense then asked R.M. whether he would give “instant credibility” to the testimony of an officer of the Orange Beach Police Department whom he knew and/or with whom he was friends. R.M. stated, “If they are in fact the officers that I know, I would believe anything they say.” When asked by defense counsel whether he would be able to “base [his] decision on their credibility, on their demeanor on the stand, on what they say, how it adds up with everything, whether it’s believable ... or, [if,] because of who they are and [his] knowing them, would [he] automatically say they must be telling the truth,” R.M. responded that “[fit’s kind of hard to say — to separate that.” There was no further attempt by the State or the trial court to determine whether R.M. would, in fact, be able to set aside his opinions and base his verdict on the law and the facts.
 
 [2]
 

 With regard to R.M., the Court of Criminal Appeals concluded:
 

 “[D]espite his best intentions, R.M.’s connections and business concerns were strong enough to indicate a probable prejudice in favor of the State. As the court noted in
 
 Wood [v. Woodham,
 
 561 So.2d 224, 228 (Ala.1990),] ‘the simple extraction of an affirmative response from a potential juror [that he believes he can decide the case only upon the evidence presented] does not necessarily absolve that juror of probable prejudice.’ ”
 

 In
 
 Wood v. Woodham,
 
 561 So.2d 224 (Ala.1990), the case cited by the Court of Criminal Appeals, we addressed the question of error with regard to the trial court’s denial of the Woods’ challenges for cause of three jurors. One of the jurors, like R.M., had stated that she would prefer not to serve on the jury. She stated that she thought her husband might know one of the participants in the trial and that she did not approve of people suing one another.
 
 Wood,
 
 561 So.2d at 225-26. When asked whether she could “sit and hear this evidence and decide this case fairly,” the
 
 *7
 
 prospective juror responded: “Yeah. I could. But, I would rather not.”
 
 Wood,
 
 561 So.2d at 226. She stated further that she would “do her best” to “decide the case based only on the evidence and [the] instructions as to the law.”
 
 Wood,
 
 561 So.2d at 226. Then, when the trial court asked the juror again whether she could “decide the case based only on the evidence and [the] legal instructions,” the juror said, ‘Tes.”
 
 Wood,
 
 561 So.2d at 226. The trial court denied the Woods’ challenges for cause. The jury returned a verdict for the defendants, and the Woods appealed. We reversed the trial court’s judgment, noting that the jurors’ statements indicated a probable prejudice and that, “[w]hile we note that both jurors eventually stated that they could decide the case based only on the evidence, the simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice.”
 
 Wood,
 
 561 So.2d at 228. We agree with the Court of Criminal Appeals that, in this case, the probable prejudice demonstrated by R.M.’s multiple contacts — both social and business — with the Orange Beach Police Department, his desire to be excused from the case because of the possible consequences to his business of his serving on the jury, and his testimony that he would automatically believe the testimony of officers he knew, outweigh his assertions that he could and would decide the case based on the evidence presented and the instructions of the trial court. Therefore, we agree with Colby and the Court of Criminal Appeals that the trial court erred in denying Colby’s motion to have R.M. removed for cause.
 

 We disagree with the State that this case does not involve multiple errors. Colby made separate motions for the removal of C.F., M.B., and R.M. from the jury, and the trial court denied each motion separately. Each of those denials was error. The State also argues that any error was harmless, because, according to the State, an impartial jury was ultimately seated. However, “[i]n each instance in which we have applied the harmless-error rule, we have been presented with only
 
 one
 
 erroneous ruling on a challenge for cause.”
 
 General Motors,
 
 883 So.2d at 672. Moreover, as previously stated in this opinion, the seated jury included “jurors who would likely have been the subject of peremptory challenge had such challenges been available.”
 
 General Motors,
 
 883 So.2d at 673.
 

 We hold that the Court of Criminal Appeals’ decision declaring harmless the trial court’s errors in denying Colby’s challenges for cause as to C.F., M.B., and R.M. conflicts with our prior decision in
 
 General Motors.
 
 Because the trial court’s errors were not harmless, Colby is entitled to a new trial. We, therefore, reverse the Court of Criminal Appeals’ decision affirming the trial court’s judgment and remand the case for that court to remand to the trial court for further proceedings consistent with this opinion.
 
 [3]
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and LYONS, STUART, SMITH, BOLIN, PARKER, and MURDOCK, JJ., concur.
 

 SHAW, J., recuses himself.
 
 *
 

 [1]
 

 . As to the other challenged jurors, the Court of Criminal Appeals concluded that the error, if any, was harmless as to all but one of them, either because they were not chosen to serve as jurors in Colby’s trial or because the State’s withdrawal of the request that the death penalty be imposed mooted the issue of some of their attitudes toward the consideration of mitigating circumstances during the penalty phase of a capital-murder trial. As to the only challenged juror who served on the jury, the Court of Criminal Appeals held that his inconsistent responses to limited questions by defense counsel did not indicate a bias against Colby.
 

 [2]
 

 . Counsel for the defense read a list of testifying officers, asking R.M. to identify the officers that he knew. The only officer R.M. indicated that he knew was Officer Greg Duck, whose testimony would relate solely to the chain of custody for the evidence.
 

 [3]
 

 . Because we hold that Colby is entitled to a new trial on the issue of conflict with
 
 General Motors,
 
 we do not address the second issue raised by Colby — the alleged conflict between the Court of Criminal Appeals’ decision here and our decisions in
 
 Clark, Bailey,
 
 and
 
 Mauricio.
 
 Based upon this latter alleged conflict, Colby asks this Court only to vacate her conviction; she does not ask us to render a judgment in her favor. Thus, our effective reversal of the trial court's judgment moots her request for relief as to the second issue, and we pretermit consideration of the merits, as well as the sufficiency, of her arguments concerning the sufficiency of the evidence.